478 F.2d 1200
 5 Fair Empl.Prac.Cas. 1207, 5 Empl. Prac.
Dec. P 8626
Alfred BRITO et al., Plaintiffs-Appellants and Cross-Appellees,
v.
The ZIA COMPANY, Defendant-Appellee and Cross-Appellant.
Manuel QUINTANA and Arthur Jaramillo, Plaintiffs-Cross Appellees,
v.
The ZIA COMPANY, Defendant-Appellee and Cross-Appellant.
 Nos. 72-1631, 72-1632.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted March 28, 1973.
Decided May 18, 1973.
 
 Melvin L. Robins, Albuquerque, N. M. (Lorenzo A. Chavez, Albuquerque, N. M., and Mario Obledo, San Francisco, Cal., on the brief) for appellants.
 John P. Burton, Albuquerque, N. M. (L. J. Maveety, Los Alamos, N. M., and William A. Sloan, Albuquerque, N. M., on the brief) for appellee and cross-appellant.
 Before SETH and BARRETT, Circuit Judges, and SMITH*, District Judge.
 BARRETT, Circuit Judge.
 
 
 1
 Alfred Brito, Max Roybal, Richard Lopez, Tony Mier, and Robert Keahbone appeal from a Judgment in their favor brought pursuant to the Civil Rights Act of 1964, 42 U.S.C.A. Sec. 2000e-2 et seq.[1] The Zia Company filed a cross-appeal. Manuel Quintana and Arthur Jaramillo are cross-appellees.
 
 
 2
 The District Court held that the employee performance evaluation test used by Zia had not been validated in accordance with the Order of the Secretary of Labor, 33 F.R. 14392 (1968). The Court entered a Judgment Nunc Pro Tunc in which it stated that certain EEOC guidelines, 29 CFR 1607 et seq.,[2] are controlling over the Secretary of Labor's Order. The Court held that Zia allowed discriminatory employment practices in its machine shop in violation of Title VII of the Civil Rights Act of 1964. It enjoined Zia from hiring, promoting or discharging employees by use of any testing method until its test complied with the requirements of the EEOC, the Secretary's Order and Title VII of the Civil Rights Act and until it shall develop empirical data supporting the validity of the test. It held that Zia's conciliation agreement with Brito had been breached in violation of the Civil Rights Act and that the action did not meet the requirements of a valid class action. It awarded some back pay to the appellants, and $2,000 in attorneys' fees. Brito was awarded nominal damages for breach of the conciliation agreement.
 
 
 3
 Zia is a contractor with the U. S. Atomic Energy Commission at Los Alamos, New Mexico. Zia employs between 900 and 1,100 workers of which about 500 are Spanish surnamed and Indian employees. When the work force had to be reduced, Zia used an employee performance evaluation test given by supervisors and foremen on volume of work, quality of work, job knowledge, dependability and cooperation. The evaluation was made while the employee was working. The appellants were laid off because of their low scores on the evaluations in May and August, 1970.
 
 
 4
 Brito was originally employed with Zia in December of 1967. He was laid off because of a reduction in force in July, 1968. He filed a charge of discrimination with the EEOC which found in his favor in October, 1969. On March 4 and 6, 1970, Brito entered into a conciliation agreement with Zia in which Zia contracted to eliminate discrimination in hiring, promotion practices and conditions of employment based on national origin and race and to reinstate Brito to his former job. Brito returned to his job on March 9, 1970. An air of hostility developed between some Anglos and Spanish surnamed employees. Brito received a written reprimand a week after he returned to work and was discharged in July, 1970, because of a low test score, along with Mier and Lopez, all machinists. Roybal, a machinist, was transferred, and Keahbone, a machinist, was terminated in September, 1970. Before the reduction in work force there were eight Anglos and six Spanish surnamed employees and one Indian in the machine shop. After the reduction, there were seven Anglos and two Spanish surnamed employees. Quintana and Jaramillo, ironworkers, were laid off in August, 1970, because of their low scores on the evaluation. Before the reduction in force there were eighteen Spanish surnamed and fourteen Anglo employees in the ironworkers shop; after the reduction, ten Spanish surnamed and twelve Anglos remained.
 
 
 5
 An evidentiary hearing was held on whether a class action should be allowed. The Court held the action did not meet the requirements of a class action pursuant to Rule 23, Fed.R.Civ.P.
 
 
 6
 The appellants contend that: (1) the trial court erred in failing to allow a class action; (2) the award of nominal damages for breach of the conciliation agreement was error; (3) the failure of the Court to award the entire back pay lost by Keahbone and Lopez was error; (4) the refusal of the Court to reinstate the appellants was error; and (5) the award of $2,000 in attorneys' fees was inadequate.
 
 
 7
 The cross-appellant, Zia, alleges that: (1) the trial court erred in allowing appellants to change theories in the case; (2) the trial court erred in entering judgment against Zia, since no violation of the Act was found; (3) the trial court erred in concluding that Zia's performance evaluation violated the Act when it did not find that the violation was deliberate; (4) the Secretary's Order was improperly applied to Zia's performance evaluation; and (5) the trial court erred in awarding relief.
 
 I.
 
 8
 The appellants contend that Brito represents a class of people composed of Spanish-speaking Americans, Spanish Americans, and Spanish surnamed Americans, who were employed or might be employed by Zia, and who had been or would continue to be adversely affected by Zia's employment practices. They contend that joinder under Rule 23, Fed.R.Civ.P. is impractical because the people are too numerous; that the relief sought is common to all; that Brito adequately represents the class; and that Zia acted or refused to act on grounds generally applicable to the class.
 
 
 9
 The District Court ruled that this action does not meet the requirements of a class action. We will not disturb that holding on appeal unless it is clearly erroneous. The District Court was correct in holding that there was no basis to proceed as a class action because the requirements of Rule 23 were not met.
 
 II.
 
 10
 Brito contends that the award of nominal damages for breach of the conciliation agreement does not adequately compensate him for loss of benefits. He also seeks punitive damages because Zia condoned an atmosphere of hostility. The contention has no merit in view of the fact that Brito was awarded damages for loss of wages and was reinstated to his former position. Brito has not established any basis for a damage award for breach of the agreement. The record supports only the award of nominal damages. Oklahoma Natural Gas Corporation v. Municipal Gas Co. of Muskogee, Okl., 113 F.2d 308 (10th Cir. 1940).
 
 III.
 
 11
 Keahbone and Lopez allege that they should have been awarded the entire amount of back pay they lost. Keahbone testified that after subtracting his earnings at other jobs from the pay he would have earned at Zia, he is entitled to receive $10,505; the Court awarded him $3,100. Lopez testified his lost wages amounted to $9,996. He asked for $9,000 and the Court awarded him $2,200.
 
 
 12
 Although the Court must accept the uncontroverted testimony of the appellants, it may exercise its discretion in finding that the appellants should have and could have exercised greater diligence in seeking other employment. Jurinko v. Edwin L. Wiegand Company, 331 F.Supp. 1184 (W.D.Pa.1971). The Court did not err in its award.
 
 IV.
 
 13
 The appellants contend that the trial court should have ordered that they be reinstated as required by the Act.
 
 
 14
 The Act states that reinstatement may be ordered; it is discretionary with the court. 42 U.S.C.A. Sec. 2000e-5(g). All of the appellants found other work except one, who could have found work. The Court did not err.
 
 V.
 
 15
 The appellants contend that the award of $2,000 in attorneys' fees is inadequate because the attorneys spent 162 hours on the case, equalling about $12 per hour.
 
 
 16
 Hours are not the sole basis for determining a fee. Weeks v. Southern Bell Telephone and Telegraph Company, 467 F.2d 95 (5th Cir. 1972). It is within the discretion of the trial court to set a reasonable fee. Barela v. United Nuclear Corporation, 462 F.2d 149 (10th Cir. 1972). There was no error.
 
 VI.
 
 17
 Zia alleges that the trial court erred in allowing the appellants to try their case on one theory, then to obtain a decision on a second theory, and finally to obtain an injunction on a third theory. Zia contends that the appellants proceeded on the theory that the Civil Rights Act controlled, then switched to the Secretary's Order, and finally argued that the EEOC guidelines controlled. The Judgment Nunc Pro Tunc was entered in accordance with EEOC guidelines. Zia argues that the pretrial order controls, and that the decision should be based on the Civil Rights Act.
 
 
 18
 It is within the discretion of the trial court to allow the parties to switch theories. The Secretary's Order and the EEOC guidelines interpret the Civil Rights Act and set forth guidelines for the validation of the test procedure. The EEOC guidelines and the Secretary's Order set forth substantially the same guidelines. There was no prejudice to Zia.
 
 VII.
 
 19
 Zia contends that since the trial court found no violation of the Act, it erred in entering judgment against it. Zia states that the appellants had the burden to prove the discriminatory effect of the test. Only when thus established must Zia prove its validity. Zia alleges that the appellants did not prove the test's discriminatory effect, therefore, it did not have to prove its validity.
 
 
 20
 In Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), Negro employees sued under Title VII of the Civil Rights Act of 1964 challenging Duke Power's requirement of a high school diploma or passing an intelligence test as a condition of employment or transfer. The tests were not designed to measure the ability to learn to perform a particular job. The Court held that neither the high school diploma nor the general intelligence test was shown to bear a demonstrable relationship to successful performance of the jobs for which it was used. The Court stated:
 
 
 21
 The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited. 401 U.S. at 431, 91 S.Ct. at 853.
 
 
 22
 Zia's test was invalid and resulted in a discriminatory employment practice. It caused a disproportionate reduction in Spanish workers in the machine shop and ironworkers shop. See Findings of Fact, Nos. 5, 13-15, 20, 21, Brito v. The Zia Company, (D.N.M.1973).
 
 
 23
 The Zia Company failed to validate the test according to the EEOC guidelines because it failed to introduce evidence of the validity of its employee performance evaluation test consisting of empirical data demonstrating that the test was significantly correlated with important elements of work behavior relevant to the jobs for which the appellants were being evaluated. Zia's own Performance Evaluation Manual for its raters stated that Volume of Work is:
 
 
 24
 . . . the volume or output of acceptable work considering the job performance standard. The employee's volume is rated according to the average daily amount of acceptable work he has produced during the review period. Don't compare him with employees in higher, lower or different classifications. We all have our good and bad days, so it is important that the rating be based on the average or typical daily output.
 
 
 25
 Zia admits that only one of the evaluators in the machine shop kept records; there were no other backup records to the performance evaluations which were maintained. As a result of the evaluations, reductions in force were accomplished late that summer and early fall.
 
 
 26
 The machine shop employees were evaluated in May, 1970 by Thomas, Pickett and Barrows. The ironworkers unit was evaluated in August, 1970 by its superintendent. The night foreman of the machine shop, Pickett, kept private records but he only observed the day workers for about half an hour per day. Pickett testified that he made the best evaluations he could but that the men he graded did not work for him and it was a "slim judgment."
 
 
 27
 Mr. Thomas, the machine shop supervisor, rated the machine shop employees. He was absent from the plant for about half of the time for about four months before the evaluation took place in May, 1970. When he was at the plant he observed the employees and he based his evaluation on their work and from talking to the inspector and engineer assigned to the machine shop. It is clear that the evaluations were based on the best judgments and opinions of these evaluators but were not based on any definite identifiable criteria based on quality or quantity of work or specific performances that were supported by some kind of record.
 
 
 28
 The test was not validated according to Zia's own guidelines in that the evaluators did not grade the employees according to their average daily amount of acceptable work produced during the review period. Therefore, the test was based almost entirely on their subjective observations.
 
 
 29
 The test was not administered and scored under controlled and standardized conditions, with proper safeguards to protect the security of test scores and to insure that the scores did not enter into any judgments of employee adequacy that are to be used as criterion measures, as required by Sec. 1607.5(b)(2) for the minimum requirements for validation. Empirical evidence supporting the test's validity based on studies employing acceptable procedures were not presented by Zia as required by the EEOC guidelines.
 
 
 30
 Title VII prohibits informal testing procedures which might discriminate against minority groups. Discrimination can be shown to exist "when there are differential rates of applicant rejection from various minority and nonminority or sex groups for the same job or group of jobs . . ." 29 CFR 1607.13. The appellants have shown that the informal testing procedures resulted in higher rates of reduction in force of minority groups.
 
 VIII.
 
 31
 Zia alleges that the trial court erred in concluding that the evaluation violated the Act because there was no finding that the violation was deliberate.
 
 Section 2000e-5(g) states in part:
 
 32
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate . . . .
 
 
 33
 "Intentionally" has been interpreted to mean that the practice was used deliberately, not accidentally. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970), cert. denied 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 937 (1971). Intent can be inferred from the operation and effect of the test. Local 189, United Papermakers and Paperworkers, AFL-CIO, CLC v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). In Griggs, supra, the Court said:
 
 
 34
 Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices. * * * [B]ut good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as "built-in headwinds" for minority groups and are unrelated to measuring job capability. * * * But Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question. 401 U.S. at 430, 432, 91 S.Ct. at 853, 854.
 
 
 35
 The use of the performance evaluation test was not accidental and the fact that the test was used with an intent to discriminate may be inferred from the statistics evidencing a greater reduction in the number of Spanish workers than Anglo employees.
 
 IX.
 
 36
 Zia alleges that the Secretary's Order is not controlling because the Judgment Nunc Pro Tunc stated that the EEOC guidelines control over the Order. Zia contends that even if the Order controls it was complied with; the test was selfvalidating in that they measured job related criteria by evaluating the employee's actual performance on the job.
 
 
 37
 This contention has no merit in view of our prior holding that the Order and the EEOC guidelines interpret the Act and the test was not validated according to the guidelines. Even though the trial court concluded that the EEOC guidelines controlled, the result would have been the same if the Secretary's Order controlled because they set forth substantially the same guidelines. The test was based primarily on the subjective observations of the evaluators, two out of three of whom did not observe the workers on a daily basis.
 
 X.
 
 38
 Zia contends that the trial court erred in awarding injunctive relief in that it benefited only non-parties. Zia alleges, accordingly, that the injunction is too broad and should be limited solely to those tests which discriminate. Zia contends, too, that Roybal's claim constitutes a different cause of action not supported by the evidence. Roybal was awarded lost wages resulting from his transfer, and Zia contends he was allowed to switch theories.
 
 
 39
 An injunction may properly be issued to benefit those not before the court. Sprogis v. United Air Lines, Inc., 444 F.2d 1194 (7th Cir. 1971), cert. denied 404 U.S. 991, 92 S.Ct. 536, 30 L. Ed.2d 543 (1971). The injunction was not too broad because the test was used throughout the plant. Roybal's award of damages was proper. He was damaged and he is entitled to relief even though he did not demand it. Rule 54(c), Fed.R.Civ.P.
 
 
 40
 Affirmed.
 
 
 
 *
 Eastern District of Michigan, sitting by designation
 
 
 [1]
 42 U.S.C.A. Sec. 2000e-2(h) provides in part as follows:
 . . . it shall not be an unlawful employment practice . . . for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.
 
 
 [2]
 Section 1607.5 provides in part as follows:
 Minimum standards for validation.
 (a) For the purpose of satisfying the requirements of this part, empirical evidence in support of a test's validity must be based on studies employing generally accepted procedures for determining criterion-related validity, . . .
 (b) Although any appropriate validation strategy may be used to develop such empirical evidence, the following minimum standards, as applicable, must be met in the research approach and in the presentation of results which constitute evidence of validity:
 (1) Where a validity study is conducted in which tests are administered to applicants, with criterion data collected later, the sample of subjects must be representative of the normal or typical candidate group for the job or jobs in question.
 (2) Tests must be administered and scored under controlled and standardized conditions, with proper safeguards to protect the security of test scores and to insure that scores do not enter into any judgments of employee adequacy that are to be used as criterion measures.
 (3) The work behaviors or other criteria of employee adequacy which the test is intended to predict or identify must be fully described; and, additionally, in the case of rating techniques, the appraisal form(s) and instructions to the rater(s) must be included as a part of the validation evidence.
 (4) In view of the possibility of bias inherent in subjective evaluations, supervisors' prejudice, as, when, as new carefully developed, and the ratings should be closely examined for evidence of bias. * * * The general point is that all criteria need to be examined to insure freedom from factors which would unfairly depress the scores of minority groups.
 (5) Differential validity. Data must be generated and results separately reported for minority and nonminority groups wherever technically feasible.