**Buck GREEN et al.,
Plaintiff-Appellant,**

**v.**

**MISSOURI PACIFIC RAILROAD COMPANY, a corporation,
Defendant-Appellee.**

**No. 74–1849.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 17, 1975.

Decided July 23, 1975.

As Amended on Denial of Rehearing En Banc Sept. 15, 1975.

Francis H. Kennedy, St. Louis, Mo., Walter W. Heiser, Legal Aid Society of the City and County of St. Louis, St. Louis, Mo., was co-counsel for appellant.

Equal Employment Opportunity Commission, Susan J. Johnson, Washington, D. C., for amicus curiae.

R. W. Yost, St. Louis, Mo., for appellee.

Before JONES,* Senior Circuit Judge and HEANEY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

The Missouri Pacific Railroad Company (MoPac) follows an absolute policy of refusing consideration for employment to any person convicted of a crime other than a minor traffic offense. Appellant-Buck Green, who is black, raises the principal question of whether this policy violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (Supp. II, 1972) and 42 U.S.C. § 1981 (1970), because this practice allegedly operates to disqualify blacks for employment at a substantially higher rate than whites and is not job related.[1]

Green on his own behalf and as a class action filed this suit November 7, 1972, seeking declaratory and injunctive relief as well as back pay.[2] The district court denied Green relief on his individual claim and that of the class.[3] Green brings this timely appeal. We outline the undisputed facts.

On September 29, 1970, Green, then 29 years of age, applied for employment as a clerk at MoPac's personnel office in the corporate headquarters in St. Louis, Missouri.[4] In response to a question on an application form, Green disclosed that he had been convicted in December 1967 for refusing military induction. He stat-

---

* WARREN L. JONES, Senior Circuit Judge, Fifth Circuit Court of Appeals, sitting by designation.

1. The district court examined Green's contentions in the context of Title VII. We take a similar approach and deem it unnecessary to discuss the issue in terms of § 1981.

2. Green initially filed a complaint with the Equal Employment Opportunity Commission (Commission) on December 22, 1970, shortly after MoPac denied him employment. The Commission eventually made a determination of reasonable cause and attempted conciliation. These efforts failed and on August 11, 1972, the Commission, pursuant to Green's request, issued him a notice of right to sue and he filed this action within the allowable 90-day period.

On April 5, 1973, on the basis of Green's charges, the Commission also brought suit against MoPac in the Eastern District of Missouri. The district court, however, dismissed that action on procedural grounds and this court affirmed. EEOC v. Missouri Pacific R. R., 493 F.2d 71 (8th Cir. 1974). The Commission has filed a brief as amicus curiae supporting Green's position in this lawsuit.

3. The district court opinion is reported at 381 F.Supp. 992 (E.D.Mo.1974). The district court defined the class as those blacks denied employment at MoPac's corporate headquarters in St. Louis, Missouri, because of the company's refusal to consider persons with a criminal record other than minor traffic offenses.

4. MoPac employs about 2,000 people at its corporate headquarters.

ed that he had served 21 months in prison until paroled on July 24, 1970.[5] After reviewing the application form, MoPac's personnel officer informed Green that he was not qualified for employment at MoPac because of his conviction and prison record. Green, thereafter, sought relief under Title VII, and, when administrative conciliation failed, he brought this action.

Since 1948, MoPac has followed the policy of disqualifying for employment any applicant with a conviction for any crime other than a minor traffic offense.[6] Prior to 1972, MoPac also investigated an applicant's arrest record, but after the decision in *Gregory v. Litton Systems, Inc.,* 472 F.2d 631 (9th Cir. 1972), MoPac eliminated any arrest inquiry from its application form and ceased using arrest records as an employment criterion.

Green makes the following contentions on this appeal: (1) MoPac's policy of not hiring any person convicted of a criminal offense has a racially discriminatory effect and violates Title VII; (2) this policy is not justified by any business necessity; and (3) the district court erred in restricting the class only to black persons denied employment consideration because of a conviction record.

I. *Whether Green proved a prima facie case of discrimination.*

■■ Although the employment practice in question is facially neutral, an employment test or practice which operates to exclude a disproportionate percentage of blacks violates Title VII unless the employer can establish that the practice is justified as a business necessity. *Griggs v. Duke Power Co.,* 401 U.S.

424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *see Boston Chapter N.A.A.C.P., Inc. v. Beecher,* 504 F.2d 1017, 1019 (1st Cir. 1974); *Wallace v. Debron Corp.,* 494 F.2d 674, 675 (8th Cir. 1974); *United States v. Georgia Power Co.,* 474 F.2d 906, 911 (5th Cir. 1973); *Gregory v. Litton Systems, Inc.,* 316 F.Supp. 401, 403 (C.D.Cal.1970), *aff'd,* 472 F.2d 631 (9th Cir. 1972). Once a prima facie case of substantially disparate impact is made the burden shifts to the employer to justify the employment practice or test as a business necessity. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Rogers v. International Paper Co.,* 510 F.2d 1340, 1348–49 (8th Cir. 1975); *Rodriguez v. East Texas Motor Freight,* 505 F.2d 40, 54 (5th Cir. 1974); *Hester v. Southern Ry. Co.,* 497 F.2d 1374, 1381 (5th Cir. 1974).

■ Thus, we examine the threshold question of whether Green has presented a prima facie case. A disproportionate racial impact may be established statistically in any of three ways. The first procedure considers whether blacks as a class (or at least blacks in a specified geographical area) are excluded by the employment practice in question at a substantially higher rate than whites. *See Griggs v. Duke Power Co., supra,* 401 U.S. at 430 n. 6, 91 S.Ct. 849, 28 L.Ed.2d 158 (on the requirement of a high school diploma, the Court cited statistics from the U. S. Census Bureau that in North Carolina only 12 percent of black males had completed high school while 34 percent of white males had done so); *United States v. Georgia Power Co.,* 474 F.2d 906, 918 (5th Cir. 1973) (the court cited statistics from the South

---

**5.** Prior to Green's prosecution he had unsuccessfully sought classification as a conscientious objector by his draft board. Green did not appeal his conviction but sought post-conviction review. In proceedings which reached this court, the court, in a divided opinion, refused to review appellant's challenge to the alleged constitutional invalidity of his draft classification. *Cassidy v. United States,* 428 F.2d 585 (8th Cir. 1970). (Green's legal name at the time of these proceedings was Cassidy).

**6.** MoPac's personnel manager testified that this stringent policy occasionally has been relaxed. For example, one current employee has been convicted of disturbing the peace while another employee has been convicted of possession of intoxicants by a minor. Nevertheless, as a policy matter, MoPac denies employment to any person with a conviction record for a felony or misdemeanor (excepting minor traffic offenses).

and from the Atlanta area showing that a substantially higher percentage of whites had completed high school than blacks); *Gregory v. Litton Systems, Inc.,* 316 F.Supp. 401, 403 (C.D.Cal.1970), *aff'd,* 472 F.2d 631 (9th Cir. 1972) (the court cited national arrest statistics showing that blacks suffered a disproportionately high percentage of arrests); *Johnson v. Pike Corp.,* 332 F.Supp. 490, 494 (C.D.Cal.1971) (the court cited general studies indicating that blacks' wages were garnished at a disproportionately high rate).

The second procedure focuses on a comparison of the percentage of black and white job applicants actually excluded by the employment practice or test of the particular company or governmental agency in question. *See Griggs v. Duke Power Co., supra,* 401 U.S. at 430 n. 6, 91 S.Ct. 849, 28 L.Ed.2d 158; *Vulcan Society of the New York City Fire Dept. v. Civil Service Comm. of the City of New York,* 490 F.2d 387, 392 (2d Cir. 1973); *Bridgeport Guard, Inc. v. Members of the Bridgeport Civil Service Comm.,* 482 F.2d 1333, 1335 (2d Cir. 1973); *cf. Rogers v. International Paper Co., supra,* 510 F.2d at 1348–49.

Finally, a third procedure examines the level of employment of blacks by the company or governmental agency in comparison to the percentage of blacks in the relevant geographical area. *See Bridgeport Guard, Inc. v. Members of the Bridgeport Civil Service Comm., supra,* 482 F.2d at 1335–36; *United States v. Georgia Power Co., supra,* 474 F.2d at 910; *Butts v. Nichols,* 381 F.Supp. 573, 579 (S.D.Ia.1974) (three-judge court); *cf. Rodriguez v. East Texas Motor Freight, supra,* 505 F.2d at 54–55.

Although Green alleged that MoPac discriminates against blacks generally in its employment practices, the district court focused only on whether a disparate impact could be statistically demonstrated by MoPac's policy of automatically rejecting all applicants with a conviction for an offense other than minor traffic infractions. Here, we consider a sweeping disqualification of all persons with a past record of some unlawful behavior, *see McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 806, 93 S.Ct. 1817, 36 L.Ed.2d 668, rather than a test directed at a precise measurement of intelligence or skills. The disparity of impact, if any, will be disclosed by an examination of how that policy affects applicants and potential applicants. We agree with the approach taken by the district court and primarily limit our statistical analysis to the effect of MoPac's policies against both blacks and whites in the general population in the area from which employees are drawn (metropolitan St. Louis), and the effect of this policy upon black and white applicants for employment with MoPac.

Initially, we note that the district court recognized statistical data and treatises offered into evidence by the plaintiff which indicate that blacks are convicted of crimes at a rate at least two to three times greater than the percentage of blacks in the populations of certain geographical areas. Dr. Ronald Christensen, a qualified expert witness for the plaintiff, concluded that it is between 2.2 and 6.7 times as likely that a black person will have a criminal conviction record during his lifetime than that a white person will have such a record. He further concluded that in urban areas from 36.9 percent to 78.1 percent of all black persons would incur a conviction during their lifetimes, but that from only 11.6 percent to 16.8 percent of all white persons would acquire a conviction.

MoPac's records of employment applications at its corporate headquarters during the period from September 1, 1971, through November 7, 1973,[7] disclose that 3,282 blacks and 5,206 whites applied for employment. Of these individuals, 174 blacks (5.3 percent of the black applicants) and 118 whites (2.23 percent of the white applicants) were rejected because of their conviction records. Thus, statistically, the policy operated automatically to exclude from

7. These figures reflect the only available data.

employment 53 of every 1,000 black applicants but only 22 of every 1,000 white applicants. The rejection rate for blacks is two and one-half times that of whites under this policy.

Although the district court recognized that these statistics denote a disparate impact, the court further compared the number of blacks rejected (174) to the total pool of applicants (8,488)[8] and deemed the resulting figure of 2.05 percent as showing a "*de minimis* discriminatory effect" when compared to the percentage of blacks (16 percent) in the St. Louis metropolitan area. [381 F.Supp. 996.][9]

The trial court's use of additional statistics supporting a conclusion of a *de minimis* discriminatory effect suffers from two principal defects. First, comparing the number of black applicants rejected because of a conviction record to the total number of applicants does not reflect a disparity of impact separately against each race. Moreover, because more whites than blacks applied for employment (3,282 blacks and 5,206 whites) a comparison of the rejected blacks to the total number of applicants serves to dilute the actual discriminatory impact against blacks.

Second, comparing the resulting percentage of 2.05 against the percent of blacks in the relevant population area is of no assistance for the issue in Title VII cases focuses on whether an employer has discriminated against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The issue to be examined statistically is whether the questioned employment practice operates in a disparate manner upon a minority race or group, not whether the individuals actually suffering from a discriminatory practice are statistically large in number.

■ An employment criterion must be examined for its operation on a racially exclusionary basis—thus its effect must be measured upon blacks separately and upon whites separately. *See Griggs v. Duke Power Co., supra,* 401 U.S. at 430 n.6, 91 S.Ct. 849, 28 L.Ed.2d 158; *United States v. Georgia Power Co., supra,* 474 F.2d at 918; *Gregory v. Litton Systems, Inc., supra,* 316 F.Supp. at 403; *Johnson v. Pike Corp., supra,* 332 F.Supp. at 494; *cf.* Note, *Employment Discrimination: Statistics and Preferences Under Title VII,* 59 Va.L.Rev. 463, 468 (1973).

■ The statistics established that MoPac's employment practice under consideration disqualifies black applicants or potential black applicants for employment at a substantially higher rate than whites. Thus, Green has established a prima facie case of discrimination.

II. *Is MoPac's employment practice justified by "Business Necessity?"*

■ Once a prima facie case of discrimination has been established, the defendants must show that the employment practice in question is justified by "business necessity." The seminal decision for business necessity, of course, is *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), where the Court, in discussing the reach and intent of equal employment opportunity cases under Title VII said:

8.  The district court's statistical summary is as follows:

$$\frac{118 \text{ (whites rejected due to conviction)}}{8{,}488 \text{ (total number of applicants)}} \times 100 = 1.4\%$$

$$\frac{174 \text{ (blacks rejected due to conviction)}}{8{,}488 \text{ (total number of applicants)}} \times 100 = 2.05\%$$

[381 F.Supp. at 995.]

9.  The district court utilized the St. Louis metropolitan area as the appropriate area for population statistics. The 1970 census shows a total population in the area of 2,363,017 with an approximate nonwhite population of 390,-000.

[Title VII] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited. * * *

* * * * * *

What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification. [*Id.* at 431, 91 S.Ct. at 853.]

* * * * * *

What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract. [*Id.* at 436, 91 S.Ct. at 856.]

In *Griggs,* the Court considered professionally prepared aptitude tests and a requirement of a high school diploma by which the employer sought to measure the skills of the prospective employee to perform the required work. Here, the employment requirement does not seek to measure technical aptitude or ability but serves as an absolute bar to employment because of some prior unlawful act committed by the applicant. The Supreme Court, in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), acknowledged a distinction between the employment tests struck down in *Griggs*—standardized testing devices which, however neutral on their face, were not job related and operated to exclude a disproportionate percentage of blacks—and the qualification asserted in the *McDonnell Douglas* case where the applicant for employment, Green, had engaged in a seriously disruptive act against his prospective employer. *Id.* at 806, 93 S.Ct. 1817, 1826, 36 L.Ed.2d 668. But, Justice Powell's opinion for a unanimous court added a caveat to its holding in these words:

[P]etitioner [McDonnell Douglas] does not seek his [Green's] exclusion on the basis of a testing device which overstates what is necessary for competent performance, or through some *sweeping disqualification of all those with any past record of unlawful behavior, however remote, insubstantial, or unrelated to applicant's personal qualifications as an employee.* [*Id.* (emphasis added).]

■ We perceive this comment to suggest that a sweeping disqualification for employment resting solely on past behavior can violate Title VII where that employment practice has a disproportionate racial impact and rests upon a tenuous or insubstantial basis. Although the Supreme Court has not directly addressed this type of employment qualification, similar employment criteria have been examined and struck down by the courts as discriminatory.

In *Carter v. Gallagher,* 452 F.2d 315 (8th Cir. 1971), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972), an *en banc* court reviewed a decree of the district court relating to the recruitment, examination, and hiring practices in the Minneapolis, Minnesota, Fire Department, which allegedly discriminated against blacks and other minority groups.

The City of Minneapolis had routinely disqualified applicants for the position of fire fighter for a prior felony or misdemeanor conviction. The district court decree in pertinent part had limited the disqualification to a time period of five years, after a felony conviction or after incarceration had ended and a time period of two years after a misdemeanor conviction or two years after incarceration for such conviction had ended. The decree had provided further that any rejection of an applicant for employment because of a conviction of a crime must be based on a finding that the applicant's behavior giving rise to the conviction furnished an inference that the applicant could not fulfill the duties of a fire fighter. *Id.* at 321.

On appeal, the parties agreed that a conviction for a felony or misdemeanor should not "per se constitute an absolute bar to employment." *Id.* at 326. In reviewing this part of the decree, we said:

> The trial court in its discretion may require the defendants to submit to it for approval a rule with respect to the consideration to be given to an applicant's conviction record, which at a minimum should not treat conviction as an absolute bar to employment. We would not consider any rule giving fair consideration to the bearing of the conviction upon applicant's fitness for the fire fighter job to be inappropriate. [*Id.*] [10]

In *Butts v. Nichols,* 381 F.Supp. 573 (S.D.Ia.1974) (three-judge court), the court ruled that a provision of the Iowa Code prohibiting the employment of felons in civil service positions violated the Equal Protection Clause of the fourteenth amendment. Although the case did not arise under Title VII, the language of the court in discussing the relationship of a conviction to employment is instructive:

> There is no doubt that the State could logically prohibit and refuse employment in certain positions where the felony conviction would directly reflect on the felon's qualifications for the job (*e. g.,* conviction of embezzlement and a job requiring the handling of large sums of money). The Iowa statutory scheme, however, has an across-the-board prohibition against the employment of felons in civil service positions. There is simply no tailoring in an effort to limit these statutes to conform to what might be legitimate state interests.
>
> \* \* \* \* \* \*

> [The Iowa provision] suffers from a total lack of such narrowing criteria. As a result, the statute is both over and under inclusive: persons who clearly could serve the public interest are denied civil service jobs, while misdemeanants convicted of crimes indicating a lack of probity suffer no disqualification. In short, no consideration is given to the nature and seriousness of the crime in relation to the job sought. The time elapsing since the conviction, the degree of the felon's rehabilitation, and the circumstances under which the crime was committed are similarly ignored. [*Id.* at 580–81.]

The court in *Gregory v. Litton Systems, Inc.,* 316 F.Supp. 401 (C.D.Cal. 1970), *aff'd,* 472 F.2d 631 (9th Cir. 1972), determined that defendant's policy of barring from employment consideration anyone arrested on "a number of occasions" violated Title VII.

In *Wallace v. Debron Corp.,* 494 F.2d 674 (8th Cir. 1974), we reviewed an employer's policy of automatically discharging those individuals whose wages had been garnished more than once in a 12-month period. In remanding the factual question of whether this policy was justified by the business necessity test,[11] we observed that all "artificial, arbitrary, and unnecessary racial barriers to employment" should be removed. *Id.* at 676. *See also Johnson v. Pike Corp.,* 332 F.Supp. 490 (C.D.Cal.1971).

These cases suggest that MoPac's procedure now at issue does not meet the requirements of the business necessity test. This test has been articulated in this circuit as follows:

> It is likewise apparent that a neutral policy, which is inherently discrimina-

---

**10.** Since the parties had agreed that a conviction of a criminal offense should not be an absolute bar to public employment, this court did not need to rule directly on the propriety of the district court's ruling which disapproved of the fire department's policy of barring ex-offenders from employment as fire fighters.

**11.** The defendant conceded for purposes of the appeal that its garnishment policy would subject a disproportionate number of blacks to discharge. 494 F.2d at 676.

tory, may be valid if it has overriding business justification. * * * However, this doctrine of business necessity, which has arisen as an exception to the amenability of discriminatory practices, "connotes an irresistible demand." The system in question must not only *foster* safety and efficiency, but must be *essential* to that goal. * * * In other words, there must be no acceptable alternative that will accomplish that goal "equally well with a lesser differential racial impact." [*United States v. St. Louis-San Francisco Ry. Co.,* 464 F.2d 301, 308 (8th Cir. 1972), *cert. denied,* 409 U.S. 1116, 93 S.Ct. 900, 34 L.Ed.2d 687 (1973) (emphasis in original).]

See also *Rodriguez v. East Texas Motor Freight, supra,* 505 F.2d at 55–56; *Wallace v. Debron Corp., supra,* 494 F.2d at 677; *United States v. N. L. Industries, Inc.,* 479 F.2d 354, 364–65 (8th Cir. 1973); *Robinson v. Lorillard Corp.,* 444 F.2d 791, 798 (4th Cir.), *cert. denied,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Note, *Business Necessity Under Title VII of the Civil Rights Act of 1964: A No-Alternative Approach,* 84 Yale L.J. 98 (1974); Wilson, *A Second Look at Griggs v. Duke Power Company: Ruminations on Job Testing, Discrimination, and the Role of the Federal Courts,* 58 Va.L.Rev. 844, 859–73 (1972).

Although this circuit's articulation of the business necessity test emphasizes the ability of a prospective employee to do the work, the second part of the test, that of "no acceptable alternative that will accomplish the goal equally well with a lesser differential racial impact," constitutes a general test which applies to an employment practice such as that in this case. *See Wallace v. Debron Corp., supra,* 494 F.2d at 677.

MoPac proffers a number of reasons for claiming that its policy is a business necessity: 1) fear of cargo theft, 2) handling company funds, 3) bonding qualifications, 4) possible impeachment of an employee as a witness, 5) possible liability for hiring persons with known violent tendencies, 6) employment disruption caused by recidivism, and 7) alleged lack of moral character of persons with convictions. But, as recognized by the district court, MoPac has not empirically validated its policy with respect to conviction records, 381 F.Supp. at 996, nor shown that a less restrictive alternative with a lesser racial impact would not serve as well.

■ MoPac's witness, Dr. Robert N. McMurry, a consulting industrial psychologist to MoPac, testified that not every ex-offender will be a poor employee and that it would be preferable for a company to consider ex-offenders on an individual basis.[12] He further acknowledged that an employment practice which excludes ex-offenders accentuates recidivism. Although the reasons MoPac advances for its absolute bar can serve as relevant considerations in making individual hiring decisions, they in no way justify an absolute policy which sweeps so broadly.

■ We cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed. This is particularly true for blacks who have suffered and still suffer from the burdens of discrimination in our society. To deny job opportunities to these individuals because of some conduct which may be remote in time or does not significantly bear upon the particular job requirements is an unnecessarily harsh and unjust burden.

■ Accordingly, we hold that appellant-Green and all other blacks who have been summarily denied employment by MoPac on the basis of conviction records have been discriminated against on the

---

**12.** The district court also specifically noted that not all ex-offenders will be poor employees and that the employment of ex-offenders should be encouraged. 381 F.Supp. at 997.

basis of race in violation of Title VII and that the district court should enjoin Mo-Pac's practice of using convictions as an absolute bar to employment.[13] With respect to appellant-Green, the district court should determine whether on the date of his application his background and experience qualified him for any position for which he applied with MoPac.[14] If the court so finds, it should award him back pay. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The record does not disclose whether other members of the class also disqualified by their criminal record would have otherwise been eligible for employment with the company. Under these circumstances, we do not feel that MoPac is obligated for any back pay for the class. On remand, the court should also award the plaintiff appropriate attorney's fees for proceedings in the district court and on appeal. 42 U.S.C. § 2000e–5(k); *see Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 430 (8th Cir. 1970).

III. *Should the class be broadened?*

■ Green also claims the district court erred in refusing to broaden the class to permit him to represent those blacks who have allegedly been discriminatorily denied employment with MoPac for any reason and those blacks employed by MoPac who are allegedly restricted to racially segregated job classifications.[15]

■ We have previously held that a single charge of employment discrimination under Title VII is sufficient to initiate an inquiry into all allegedly discriminatory employment practices of an employer and that plaintiffs, even though they may be rejected applicants or discharged employees, may represent this broad class and raise all relevant issues. *See Reed v. Arlington Hotel Co.*, 476 F.2d 721, 723 (8th Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973); *Parham v. Southwestern Bell Telephone Co., supra*, 433 F.2d at 425–26. Nevertheless, the district court is vested with some discretion in determining the parameters of the class. *See Brito v. Zia Co.*, 478 F.2d 1200, 1204 (10th Cir. 1973); *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1123 (5th Cir. 1969).

Green's complaint raised for adjudication a specific employment practice involving factual questions relevant only to the limited class of blacks with conviction records. Under the particular circumstances in this case, we cannot say that the district court improperly limited the class.

We affirm in part and reverse in part and remand for further proceedings in conformity with this opinion.

## ORDER DENYING PETITION FOR REHEARING EN BANC

The petition for rehearing en banc in the above case is denied by four of the

---

13. The EEOC guidelines require validation and evidence of a high degree of utility of employment tests. 29 C.F.R. § 1607 (1974). These include standardized tests as well as qualifying or disqualifying personal history or background requirements. 29 C.F.R. § 1607.2. The district court rejected these guidelines as inappropriate for MoPac's employment practice here in question. The application of these guidelines to the use of conviction data in a less restrictive way is not now before us and, therefore, we need not resolve that question.

14. We note that Green's conviction was for refusal to submit to military induction after he had been denied conscientious objector status. He has paid his debt to society for a nonviolent crime. It is difficult to view this convic-

tion as related to any job qualification except in a most remote way. Although one of MoPac's witnesses, Dr. McMurry, expressed some reservations about Green, we note that Green worked as a clerk during his 21 months of imprisonment and at the time of trial in this case was employed by the Lead Poisoning Control Service of the City of St. Louis and had received a "superior" rating from his supervisor. The supervisor testified that "superior" ratings are given very infrequently.

15. The district court initially ruled against Green on this issue in *Green v. Missouri Pacific R.R.*, 62 F.R.D. 434 (E.D.Mo.1973), and the court subsequently again refused to broaden the class. 381 F.Supp. at 993.

judges voting in favor of the denial. Judge Webster is ineligible to vote, having sat in the district court on preliminary matters in this case. Three of the judges vote in favor of the rehearing en banc.

Gibson, Chief Judge, joined by Judges Stephenson and Henley, would grant the petition for rehearing en banc for the following reasons.

The rule enforced by Missouri Pacific Railroad Co. (MoPac) in the present case which prohibited the employment of those with criminal records is not racially discriminatory. Rather, it discriminates against both blacks and whites on the basis of their criminal records.

Title VII, which proscribes covert discrimination, requires a showing of a disparate effect upon a protected class. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), found an adequate disparate effect when it was shown that the aptitude tests used there disqualified 94 percent of blacks, while only 42 percent of whites were excluded because of inability to pass the tests. The disparity in the present case was a ratio of 5.3 percent blacks excluded to 2.23 percent whites. As found by the District Court, this appears to be *de minimus* in light of the total number employed by MoPac. In 1970, the year that Green was rejected, 29 percent of the employees hired by MoPac in the St. Louis Metropolitan area were black, although blacks comprised only 16.4 percent of that area. *Green v. Missouri Pac. Ry.*, 381 F.Supp. 992, 998–1000 (E.D.Mo. 1974). Contrary to the panel holding in the instant case, it does not appear that black applicants were disqualified at a "substantially higher" rate than whites.

Title VII is remedial in nature, not punitive. It is intended to ensure non-discriminatory and fair employment practices, not to invade every province normally reserved for the employers' business judgment. MoPac's policy disqualified a very small percentage of *all* applicants and affected only 3 percent more blacks than whites. It is conceivable that *any* qualification for employment or promotion can be shown by statistics or otherwise to have *some* effect, however minimal, on blacks, women or other protected groups. This is not to say that these qualifications are "built-in headwinds" for the protected groups. *Griggs v. Duke Power Co., supra* 401 U.S. at 432, 91 S.Ct. 849. Title VII should be construed in a manner to preserve the employers' right to make reasonable business judgments in these matters based upon the exigencies of the particular business.

The evidence in the above case, as was that presented in *Butts v. Nichols*, 381 F.Supp. 573 (S.D.Ia. 1974), is too "inconclusive" to show racial discrimination. In effect, the present case has judicially created a new Title VII protected class— persons with conviction records. This extension, if wise, is a legislative responsibility and should not be done under the guise of racial discrimination.

In view of the impact of this decision and the apparent division in our court on this issue, we feel an en banc hearing would be of further illumination in this evolving field of the law.