**Francine M. CRAIG, Plaintiff,**

v.

**DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, Defendant.**

No. 77–0622–CV–W–3–6.

United States District Court, W. D. Missouri, W. D.

March 4, 1981.

Elmer C. Jackson, Jr., Kansas City, Kan., Clifford Spottsville, Kansas City, Mo., for plaintiff.

Frances Reddis, Dept. of Health and Welfare Services, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

SACHS, District Judge.

This is a Title VII race discrimination case brought against the Department of Health, Education and Welfare, now Health and Human Services, under 42 U.S.C. § 2000e et seq., as amended in 1972, 42 U.S.C. § 2000e–16.

Francine Craig, a probationary employee in the mail room of the Social Security Office ("Mid America Program Center"), was temporarily transferred to other work and then forced to resign her position shortly before the end of her probationary period, in April, 1974. The forced resignation resulted from a newspaper report which identified her as having pleaded guilty to possession of a stolen government check, and having been placed on probation by the sentencing judge. Ms. Craig, a black first offender, was sentenced under the Youth Corrections Act. The offense was committed shortly prior to her federal employment, in March 1973, during a time when she was unemployed and in economic stress, being responsible for the care of two small children. At the time of her forced resignation a year later, her superiors had no complaint about her job performance or her conduct during her period of government service.

The timing of the newspaper report was unfortunate for Ms. Craig, as several government checks that had passed through the mail room had recently disappeared and been altered and cashed. A Secret Service investigation was in progress. There was no particular reason to suspect Ms. Craig, and she had not been identified after giving writing samples during the investigation. When questioned concerning the publicized offense, she offered to take a "lie detector test" pertaining to the mail room investigation. The offer was not accepted by the government. Her superiors now deny that they took action against her because of any suspicion relating to the mail room operation, although there was testimony that her offense caused them to consider her a high risk employee. A factor in the decision to terminate her was the desired effect of deterring further thefts from the mail room.

The former director of the Program Center denied that he sought to make an "example" of Ms. Craig, but asserted that merely transferring her to a less sensitive position might provide the thief (if found) with an argument for lenient treatment. He further testified that he did not wish to have two classes of employees, divided according to supposed financial trustworthiness. Published personnel guides, however, apparently recommend transfers as an alternative to terminations, thereby necessarily creating different classifications of acceptable employees.

The termination was summarily put into effect, having been agreed to by the director and his local personnel officers prior to any notice to or conference with Ms. Craig.[1] She was given the choice between resignation and termination, and chose resignation. The reason given for summary action was that the government wished to be rid of Ms. Craig in a matter of days, to avoid her acquisition of procedural rights which would accrue upon her satisfactory completion of the year's probationary period.

■ The government's assertion that the resignation was "voluntary" is spurious, insofar as it may be asserted as a waiver of Title VII claims, and is not presented as a legal defense. The resignation was obviously coerced, being offered as the least distasteful alternative. Regardless of its effect in a normal civil service setting (*Christie v. United States*, 518 F.2d 584 (Ct.Cl.1975)), it is not pertinent here, as the doctrine of constructive discharge is applicable to Title VII cases and would allow the same relief as though plaintiff had been formally terminated. *Thompson v. McDonnell Douglas Corp.*, 552 F.2d 220, 223 (8th Cir. 1977); *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980) (where reasonable person "would have felt compelled to resign").

■ The race discrimination claim has two basic facets: (1) disparate treatment is claimed, in that a white employee with a felony record was retained, when his case was reconsidered in April, 1974; and (2) felony discharges are said to be legally suspect, because of disparate racial impact.

1. All pertinent local officials are white, although one testified that he consulted a black supervisor in Baltimore, and obtained his concurrence.

While I am of the view that Ms. Craig has probably been unjustly treated, and possible procedural illegality is not discounted, I cannot fairly conclude that race discrimination has been proved. Using the language and purpose of Title VII as controlling, defendant must prevail.

Plaintiff bases a legal argument on *Green v. Missouri Pacific Railroad Company*, 523 F.2d 1290 (8th Cir. 1975). In that case a divided court struck down the railroad's policy of disqualifying all applicants with felony convictions, upon proof that the particular employer's rejection rate for blacks was two and one-half times that of whites under the challenged policy. *Green* was a "disparate impact" case, requiring a valid justification of a general practice which has an impact unfavorable to minorities. *Green* applies to a claim of discriminatory discharge from federal service. *Marshall v. Klassen*, 15 FEP Cases 87 (S.D.Ind.1977).

The present case contains no statistical studies upon which to base a conclusion of disparate impact. It has not been suggested that courts should take judicial notice of probable disparate impact of a rule against employing persons with felony convictions. Moreover, the evidence here does not show a blanket policy of discharging or refusing to employ all felons. On the contrary, a somewhat flexible policy is here in issue, and the agency attempts to tailor its practices to meet its needs. While there may have been slippage from ideal practices, it would appear the agency attempts to follow legal principles which *Green* cites as "instructive" (l.c. 1297):

> " 'There is no doubt that (an employer) could logically prohibit and refuse employment in certain positions where the felony conviction would directly reflect on the felon's qualifications for the job (e. g., conviction of embezzlement and a job requiring the handling of large sums of money).' "

The present case illustrates acceptable policy, in that a black clerk-typist with a record of thefts of checks from the mail and other offenses was retained in defendant's service after an investigation completed only a few months prior to the adverse action involving plaintiff, a mail room employee engaged in the processing of checks.[2]

Turning to the claim of disparate treatment, the white employee who was retained was not convicted of a similar job-related offense. He was convicted of possession of marijuana. Like Ms. Craig, he was placed on two years' probation (he was, however, fined $1,000). The white male employee had *no record of dishonesty*, a subject on which this agency was particularly sensitive, except in connection with driver's authorization forms which were attributable to poor advice from others. His continued employment in the file room and as an occasional driver for the agency is clearly distinguishable and does not evidence race discrimination.

Plaintiff's trial brief states that she will establish a prima facie case by showing, among other things, "that more favorable treatment was accorded to a white person in the same or similar circumstances." Having concluded that a marijuana charge is quite different from the charge to which plaintiff pleaded guilty, and that plaintiff's offense presents greater risks to an employer processing funds, I conclude that the prima facie case has not been established. In the alternative, if disparate treatment of felons is deemed to be the prima facie case, that has been shown, but the disparate treatment has been credibly explained by defendant.

Having rejected plaintiff's disparate impact and disparate treatment claims, I now consider an underlying theory, not fully articulated, but implicit in some of the testimony and in counsel's presentation: plaintiff would have the Court draw the necessary statutory inference that the forced res-

2. It is true that Ms. Craig was temporarily transferred to a less sensitive position immediately before her forced termination, and might assert that the decision in her case was not properly designed to protect the employer's legitimate needs. This incident was not shown to evidence a policy having general impact but was part of the individual treatment of which Ms. Craig complains.

ignation was "because of (her) race" in that her superiors were white, and her treatment was so unjust and procedurally irregular that she infers racial bias. Although the desired inference is outside the pattern of formulas developed by the courts for analysis of discrimination claims, I do not reject it out of hand. The Supreme Court has announced that "rigid, mechanized (and) ritualistic" tests should not be employed in evaluating Title VII cases. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Since courts know that "more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting," it would seem logically possible to infer discriminatory intent from "totally arbitrary" treatment, given the pervasive nature of racial prejudice.

While I might draw such an inference in some future Title VII case, it would seem that there should be presented (1) conduct which is more "totally arbitrary" than I could find in this case, (2) some further extrinsic evidence tending to show racial prejudice or discrimination, or (3) serious issues of credibility of disclaimers of bias, derived from hearing the defendant's witnesses. As the Eighth Circuit Court of Appeals has noted, a Title VII case must often be decided on the trial court's appraisal of the credibility of witnesses, in considering an employer's justification of adverse action. *Vaughn v. Westinghouse Electric Corp.*, 620 F.2d 655, 660 (8th Cir. 1980). While defendant's evidence may not have been creditable, it was credible.

A considerable portion of plaintiff's proof centered on whether defendant had followed its own regulations and personnel guidelines, particularly in procedural aspects, when it hurried through plaintiff's forced resignation in advance of the employment anniversary date when her probationary status would be completed. I find it unnecessary to decide whether there was procedural regularity, because defendant's witnesses made an explanation for the rush, and I have no reason to conclude that it was racially motivated.

One final facet of the case should be considered. The alleged procedural irregularity conceivably violated Ms. Craig's legal rights, as a probationary employee. See, *e. g., Beeson v. Hudson*, 630 F.2d 622, 626–7 (8th Cir. 1980). I find it unnecessary to analyze that question closely, (partly because it is not fully briefed), because I conclude that where individual mistreatment because of race is the ultimate issue, questions of legality of the employer's procedures, like the reasonableness of its conduct, has some probative value but is not controlling as to a finding of discrimination.

One might infer from language of the Supreme Court, as relied on in Eighth Circuit opinions, that Title VII plaintiffs complaining of their individual treatment are entitled to prevail unless the employer acted "legitimately." *Vaughn*, supra, 620 F.2d at 658–9; *Martin v. Arkansas Arts Center*, 627 F.2d 876, 879 (8th Cir. 1980); *Cross v. United States Postal Service*, 636 F.2d 409 (8th Cir. 1981). Rather than suppose the appellate courts are incorporating into Title VII all local, state and federal laws and regulations, making that statute a catch-all for any violation of law adversely affecting a minority group employee, I believe the references to legitimacy of employer conduct must be understood in light of the *Furnco* rationale, set forth above. When employer conduct is either "totally arbitrary" or unlawful the eccentric nature of such conduct may often be explicable in terms of race discrimination. In the present case, even assuming a collateral violation of Ms. Craig's procedural rights, for reasons previously stated I cannot conclude that race discrimination occurred when she was forced to resign.

There is thus no way I could conscientiously rule for plaintiff, although her case has obvious appeal.

The foregoing memorandum, together with my statements from the bench at the conclusion of the trial, shall constitute my findings of fact and conclusions of law in this case, pursuant to rule 52(a), F.R.Civ. Proc.

It is therefore ORDERED that judgment be entered in favor of defendant, at plaintiff's costs.