Jane CATLETT, Patricia Leembruggen, Grace Tuter and Adeline Kallemyn, individually and on behalf of all others similarly situated, Plaintiffs,

v.

MISSOURI HIGHWAY AND TRANS-PORTATION COMMISSION, et al., Defendants.

No. 78–4061–CV–C–5.

United States District Court, W.D. Missouri, C.D.

Dec. 5, 1983.

Lisa Van Amburg, Karen Plax, Raytown, Mo., for plaintiffs.

John Gladden, Asst. Counsel, Paula Lambrcht, Asst. Counsel, Missouri Highway & Transp. Com'n, Jefferson City, Mo., for defendants.

## ORDER AND MEMORANDUM

SCOTT O. WRIGHT, District Judge.

### I. *Introduction*

Plaintiffs have filed a class action sex discrimination suit against the Missouri Highway and Transportation Commission (hereafter "Highway Commission") pursuant to 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* The representative plaintiffs, Jane Catlett, Patricia Leembruggen, Grace Tuter and Adeline Kallemyn, allege as individuals and on behalf of the class that the Highway Commission failed and refused to hire women for the position of maintenanceman on the basis of gender, established and maintained job classifications which resulted in the exclusion of women, maintained a policy and practice of recruitment which had the effect of denying job opportunities to qualified female applicants, and refused to implement objective guidelines to correct the alleged discriminatory practices.

The remedies sought by the plaintiffs include damages for back wages and lost benefits of employment, as well as declaratory and injunctive relief. On April 26, 1982, pursuant to Fed.R.Civ.P. 42(b), the

Court ordered that the suit be severed into separate trials on the issues of (a) liability and (b) prospective equitable relief, monetary damages and attorneys' fees. By order dated August 9, 1982, the Court certified the class to encompass all women who applied or who might have applied for a maintenance position in District Eight of the Highway Commission between January 1, 1975 and the last day of May, 1980.

Plaintiffs' cause of action under 42 U.S.C. § 1983 was brought against the Highway Commission, Robert N. Hunter in his official capacity as Chief Engineer of the Highway Commission, and V.B. Unsell in his official capacity as the District Engineer for District Eight of the Highway Commission. The trial of this case commenced on September 15, 1983 and concluded on September 23, 1983. On the § 1983 claims, the jury returned verdicts in favor of the class and against the Commission, Hunter, and Unsell, and returned verdicts for the defendants on the individual § 1983 claims of the four named plaintiffs.

On the Title VII claim, the Court, having heard the testimony at trial and having reviewed the voluminous exhibits submitted by the parties, has concluded for the reasons discussed below that the Highway Commission, through its recruitment and hiring policies, engaged in a pattern and practice of sex-based employment discrimination against the class. The Court also finds that the individual plaintiffs were denied employment opportunities by the Highway Commission because of their sex in violation of Title VII.

FINDINGS OF FACT

1. Named plaintiffs Jane Catlett, Grace Tuter, Adeline Kallemyn and Patricia Leembruggen are female citizens of the United States and resided in the Western District of Missouri at all times relevant to this suit.

2. The defendant Missouri Highway & Transportation Commission is an agency of the State of Missouri organized and existing under the laws of the State of Missouri and is an employer within the meaning of Title VII of the Civil Rights Act of 1964. Its headquarters and central personnel division are located in Jefferson City, Missouri. The Commission is the agency responsible for the maintenance and upkeep of the roads in the State of Missouri. On January 1, 1980, the Missouri State Highway Commission merged with the Missouri Department of Transportation to become the Missouri Highway & Transportation Commission. The Missouri Highway & Transportation Commission is divided geographically into ten districts which are composed of counties and the City of St. Louis.

3. District Eight of the Highway Commission is headquartered in Springfield, Missouri, and consists of the Missouri counties of Christian, Dallas, Greene, Hickory, Laclede, Phelps, Polk, Pulaski, Stone, Taney and Webster.

4. Each of the ten districts of the Missouri Highway & Transportation Commission is headed by a District Engineer and each district has a Maintenance and Traffic Division which is headed by a District Maintenance and Traffic Engineer.

5. The job which is the subject matter of this action is the "maintenanceman" position, which is under the Maintenance & Traffic Division. The Maintenance & Traffic Division is responsible for the upkeep of the 32,000-mile highway system of the State of Missouri and conducts traffic studies of operational improvements to the highway system. The Maintenance & Traffic Division has the largest number of employees of any division and the maintenanceman job is the single largest job category in the Highway Commission. The Highway Commission considered the maintenanceman position to be an unskilled or semi-skilled position.

6. The maintenanceman job is the entry level position within the Maintenance and Traffic Division, requiring no prior experience with the Highway Department before initial hire. It is the largest single job category in the Missouri Highway & Transportation Commission. The basic requirements for initial hire into the maintenance-

man job are that the person have at least an eighth-grade education and an ability to operate lightweight motor equipment such as pickup trucks, tractors or mowers. The maintenanceman job consists of a variety of low-skilled or semi-skilled duties such as mowing the right-of-way, plowing snow off the roads in the winter, filling potholes, maintaining buildings and rest areas, and performing minor maintenance tasks on equipment.

7. Plaintiff Jane Catlett filed a charge of discrimination with the Missouri Commission on Human Rights on July 21, 1975, and a similar charge with the Equal Employment Opportunity Commission on March 20, 1976, alleging that the Highway Commission failed to hire her for a maintenanceman position because of her sex. On December 15, 1976, the Highway Commission received a notice from the Equal Employment Opportunity Commission of Catlett's charge of discrimination. Catlett received a "notice of right to sue" letter from the United States Department of Justice on December 6, 1977. Plaintiff Catlett filed this lawsuit on March 3, 1978, within ninety days of the receipt of her notice of right to sue.

8. Federal jurisdiction is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000e *et seq*.

9. Jane Catlett was the only plaintiff to file a charge of discrimination with either a state or federal agency. Individual plaintiffs Kallemyn, Tuter and Leembruggen failed to file any discrimination charge with any state or federal agency.

### Recruitment Process for the Maintenanceman Job

10. The Highway Department in District Eight relied primarily on word-of-mouth recruitment for the maintenanceman position from January 1, 1975 through May 31, 1980. Occasionally, the Highway Commission in District Eight would notify the Missouri Division of Employment Security of job vacancies in the maintenanceman position, but most job applicants applied

directly to the Highway Commission by walk-in application.

11. The Highway Commission in District Eight did not advertise in the news media for applicants for the maintenanceman position from January 1, 1975 through May 31, 1980.

12. The maintenanceman work force in District Eight was all male until December, 1976, when the first female was hired by the Commission.

13. For purposes of evaluating the impact of the Highway Commission's recruitment procedures in District Eight, a moderate definition of the applicant pool to which the actual number of applicants could be compared is that group of persons who reside within the eleven counties of District Eight and who are in the civilian labor force as defined by the United States Census for 1970 and for 1980 in the job categories of sales, blue collar, farm, service and clerical, but excluding managerial, technical and professional workers, and who are between the ages of eighteen and seventy years and who have a driver's license and an eighth-grade education.

14. A more conservative definition of the applicant pool for District Eight would be that group of persons who reside within the eleven counties of District Eight and who are in the civilian labor force as defined by the United States Census for 1970 and for 1980 in all job categories except managerial, technical, professional and clerical workers and who are between the ages of eighteen and seventy years and who have a driver's license and an eighth-grade education.

15. The available applicant pool in District Eight can be estimated for each year between 1970 and 1980 by adjusting the census data on a straight line method so as to allocate the difference in the numbers in the census data between 1970 and 1980 equally in each year. The percentages of women in the relevant labor pool under the moderate definition ranged from 42% in 1970 to 48% in 1980, and under the conserv-

ative definition the percentages ranged from 32% in 1970 to 37% in 1980.

16. In District Eight, the following numbers of males and females were hired during the relevant time period for the maintenanceman position.

| | Males Hired | Females Hired |
|---|---|---|
| 1975 | 8 | 0 |
| 1976 | 2 | 1 |
| 1977 | 21 | 2 |
| 1978 | 21 | 5 |
| 1979 | 16 | 0 |
| 1980 (1/1–5/31) | 2 | 0 |

17. The actual and expected number of female applicants for the maintenanceman position in District Eight, based on census data of the relevant applicant pool, and assuming a recruitment process which does not have an adverse impact on potential female applicants, is as follows:

| | Female Applicants | Female Applicants Expected, Conservative Definition of Labor Force | Female Applicants Expected, Moderate Definition of Labor Force |
|---|---|---|---|
| 1975 | 9 | 183 | 304 |
| 1976 | 16 | 234 | 304 |
| 1977 | 55 | 285 | 369 |
| 1978 | 120 | 326 | 424 |
| 1979 | 88 | 270 | 350 |
| 1980 (1/1–5/31) | 24 | 103 | 133 |

The disparity in the actual number of females who applied for the maintenanceman jobs in District Eight compared to the number of expected female applicants based on the conservative and moderate definitions of the applicant pool is statistically significant.

18. In District Eight of the Highway Commission, the static maintenanceman workforce as of January 1st of each year was as follows:

| | Males | Females | Expected No. of Female Workers Conservative Definition | Moderate Definition |
|---|---|---|---|---|
| 1975 | 198 | 0 | 69 | 90 |
| 1976 | 193 | 0 | 68 | 89 |
| 1977 | 192 | 0 | 69 | 90 |
| 1978 | 190 | 2 | 70 | 91 |
| 1979 | 189 | 6 | 72 | 93 |
| 1980 | 188 | 5 | 73 | 93 |

There is a statistically significant disparity in the number of women in the static workforce compared to the number of women in the available labor force in District Eight under both the conservative and moderate definitions in each year for 1975 through 1980.

19. The actual number of females hired in District Eight for the maintenanceman position compared to the number of females expected to be hired under the conservative and moderate definitions of the labor force is as follows:

| | Total Hires | Females Hired | Expected Hires, Conservative Definition | Expected Hires, Moderate Definition |
|---|---|---|---|---|
| 1975 | 8 | 0 | 3 | 4 |
| 1976 | 22 | 1 | 8 | 10 |
| 1977 | 23 | 2 | 8 | 11 |
| 1978 | 26 | 5 | 9 | 12 |
| 1979 | 16 | 0 | 6 | 8 |

For the years 1976 through 1979, there is a statistically significant difference between the number of women hired for maintenanceman positions in District Eight and the number of women expected to be hired under the conservative and moderate definitions of the labor force.

20. Of the 89 males who were hired for the maintenanceman position in District Eight during the relevant time period, 29 of them either listed on their applications references who were employees of the Highway Commission, or had interview sheets which reflected that they were known by Highway Commission employees.

21. After the Highway Commission began hiring women for maintenanceman positions on December 1, 1976, the number of women applying for the position in subsequent years increased substantially.

22. The females listed on Plaintiff's Exhibit 421 filed applications for maintenanceman positions in District Eight between January 1, 1975 and May 31, 1980 and were not hired for entry maintenanceman jobs. These female applicants are members of the class except for those who have requested to be excluded from the class according to the court records.

23. All of the male applicants listed on Plaintiff's Exhibit 408 were hired for entry maintenanceman jobs in District Eight between January 1, 1975 and May 31, 1980, and at the time they were hired there were qualified female applicants, with the exception of two hires on February 1, 1975.

24. In December of 1976, Chief Engineer Robert N. Hunter issued a directive to all District Engineers to the effect that the Commission's traditional methods of recruitment must no longer be relied upon to recruit female and minority applicants, and that advertising should be undertaken to increase the number of female and minority applicants. Hunter directed that local population statistics should be used as a guide in recruitment efforts. Neither Hunter nor the District Engineer in District Eight, V.B. Unsell, however, followed through or implemented this directive nor took any meaningful steps to increase the number of female applicants. Despite the directive, there were no advertisements in the media for the maintenanceman openings, nor were efforts made to contact women's groups in the community to advise the public of the Highway Commission's willingness to hire women as maintenancemen in District Eight.

### Application Procedures of the Highway Commission

25. All written personnel policies were centrally formulated at the Highway Commission headquarters in Jefferson City, under the supervision of Chief Engineer Hunter. Implementation of these personnel policies was overseen by the central headquarters in Jefferson City under the supervision of Hunter, and Hunter had final responsibility to approve personnel policies, subject to the approval of the Missouri Highway & Transportation Commission. A Personnel Committee appointed by Hunter adopted personnel policies, including hiring and recruitment policies to be included in the Personnel Management Manual, which is disseminated to each District.

26. All recommendations for hire for maintenanceman must be approved by Chief Engineer Hunter in the central office. Only Chief Engineer Hunter has the authority to hire. In each district of the Highway Commission the selection of an applicant for hire into any job position must be approved by the Maintenance & Traffic Engineer and then by the District Engineer before the recommendation is sent to Jefferson City for approval. The central office in Jefferson City maintains a personnel file on each employee of the Highway Department which includes a copy of the employee's application form. The Central Personnel Office also maintained a list of all females employed in the maintenanceman positions.

27. Robert Hunter personally noticed every recommendation to employ a female for maintenanceman that came across his desk because of the few number of women who had been recommended for hire.

28. District Eight used the uniform application for employment form known as the P–1 form which all applicants must file with the Commission to be considered for any job with the Commission. The centrally developed and uniformly disseminated Job Interview Evaluation Form (Form P–20) has been used in District Eight since January, 1977.

29. Effective June 1, 1980, the central headquarters imposed upon all districts a uniform hiring freeze prohibiting any new hires for maintenanceman positions. This freeze has since been lifted.

30. For each vacancy, the Personnel Division of the Missouri Highway & Transportation Commission assures itself that there is an authorized opening. Only the Highway Commission headquarters has the authority to authorize the filling of job vacancies for the various job categories, including maintenanceman.

31. The Missouri Highway & Transportation Commission Form P–1, titled Application for Employment, is the standard application for employment used for entry maintenanceman positions in District Eight and has been since January 1, 1974.

32. Form P–1, Application for Employment, is completed and signed by all persons seeking employment with the Highway Commission pursuant to Policy 5000 of the Personnel Management Manual of the Missouri Highway & Transportation Commission. In District Eight after January 1, 1977, it was standard procedure for a P–20

interview form to be completed and to be attached to the applicant's application form.

33. The completed P–1 application forms are reviewed by employees of the Commission in the regular course of business and are retained in the District office.

34. The completed P–1 forms are retained as active applications for one year from the date on the application form pursuant to Policy 5000 of the Personnel Management Manual of the Highway Commission. Consequently, an applicant for maintenanceman is eligible to be considered for all vacancies which occur within one year after the application is filed. All applications for employment with the Highway Commission are deemed inactive one year after the date the application is filed with the Commission unless the applicant updates the application for employment.

35. Most persons interested in maintenanceman positions contacted the Highway Department directly rather than the Division of Employment Security.

36. As a result of the Highway Commission's failure to hire women, potential female applicants were discouraged from applying for the maintenanceman position. Moreover, there was at least one instance where Highway Commission employees tried to discourage a female applicant by incorrectly advising her that the application could be obtained only in Springfield or Jefferson City, rather than at the maintenance shops near the applicant's home.

### Hiring Process for the Maintenanceman Position

37. There were no females hired in District Eight for the maintenanceman position until after Jane Catlett filed her charge of discrimination with the Equal Employment Opportunity Commission.

38. In District Eight of the Highway Commission, the maintenance foremen, maintenance area supervisors, and the maintenance superintendents screen, evaluate, and recommend for hire applicants for the maintenanceman position. During the

relevant time period, all the persons occupying these job categories were male. No written or verbal guidelines on hiring procedure were communicated to the Highway Commission employees in District Eight who had authority to screen, interview, or recommend applicants for employment into the maintenanceman position. In the absence of effective guidelines, the persons charged with such authority were free to exercise their unrestricted discretion in screening and evaluating applicants for hire. As a result, the process of screening applications to select applicants to be interviewed for the maintenanceman position was arbitrary, subjective, and inconsistent.

39. Following the employment interviews, the foremen and area supervisors recommend an individual for hire to the Maintenance Superintendent, who then makes a recommendation to the District Maintenance and Traffic Engineer. The Maintenance and Traffic Engineer makes a recommendation to the District Engineer who gives final approval and then forwards the recommendation to the central office in Jefferson City. The Chief Engineer must sign off on all recommendations and has actual notice as to the sex of the new hires for the maintenanceman position.

40. One of the qualifications for the position of maintenanceman is the ability to operate lightweight motor equipment. The application form used by District Eight employees to evaluate applicants, however, did not request that the applicant indicate relevant experience involving lightweight motor equipment. Although the application requested information concerning the applicant's past employment record and gave the applicant the opportunity to indicate training in areas such as carpentry, engine mechanics and heavy equipment operation, the application did not seek or provide the applicant with the opportunity to describe relevant experience acquired through non-paid farm and truck-driving experience. Numerous female applicants for the maintenanceman position had experience with lightweight motor equipment through non-paid or self-employed farm

and trucking experience, but were not able to indicate this type of experience on the application form. Not all applicants for the position of maintenanceman were interviewed for the position, however, as some applicants were screened on the basis of information contained on the application form, or on the basis of the personal knowledge of the selecting official regarding a particular applicant. As a result of the failure of the application form to provide a space for the listing of unpaid experience or lightweight motor equipment experience, there was a reduced likelihood that these otherwise qualified female applicants would be selected for an interview.

41. The Highway Commission and District Eight did not provide the interviewers with training or instruction concerning the interview and selection process, and there were no written guidelines established to regulate the interview procedure. As a result, different hiring standards were applied to female applicants than were applied to male applicants. For example, in evaluating applicants for hire, interviewers in District Eight discounted farm experience of female applicants, and yet relied on the same type farm experience in hiring male applicants. Similarly, the District Eight interviewers rated the work experience of female applicants as laborers, groundkeepers and road crew workers as unrelated to maintenance work, while males with similar experience were described by interviewers as having related experience.

In addition, distance requirements for the maintenanceman position were applied differently to females, as some female applicants who lived within twenty miles of a job vacancy were told that they did not live close enough for emergency duty, while some males who lived more than twenty miles from a vacancy location were interviewed and hired. Similarly, some highly qualified female applicants were not interviewed for vacancies near to where they lived, nor were they given an opportunity, unlike male applicants, to interview for vacancies for which they would have to move to be hired. Moreover, there were instances where District Eight officials interviewed female applicants who lived far from a job vacancy when there were active applications of females who lived close to the vacancy, and failed to interview the same women previously interviewed for vacancies near to where they lived.

Regarding those women who were interviewed, the interviewers discouraged several female applicants by asking questions in a manner indicating that the interviewers did not believe the applicant could handle the job, while the interviewers did not question male applicants in a similar manner. During the interviews, the interviewers repeatedly rejected the assertions of female applicants that they were willing and able to perform maintenanceman duties by making comments on the interview sheets such as "I am not sure that she would be satisfied although she strongly indicates that our work is what she is looking for," and "she applied for job as flagman and might not be happy with routine maintenanceman duties even though she admitted willingness to try." The interviewers, however, accepted similar assertions by male applicants without expressing similar reservations.

As a result of the unregulated interview process, several employment decisions were made in District Eight that give rise to an inference of gender based discrimination. For example, a male applicant with clerical experience and no other related experience was hired as a maintenanceman, while a female applicant with clerical experience was rejected due to her lack of job experience and was encouraged to seek a clerical position. Similarly, a male applicant who lacked any type of experience with light motor equipment was hired as a maintenanceman in District Eight, while a female applicant with farm experience and who had operated a tractor and brush hog mower was considered for the same job but was not hired. A highly qualified female applicant was rejected ostensibly because of her frequent job changes, while males with more frequent job changes were hired as maintenancemen.

42. The employment interviews in District Eight for the maintenanceman position were conducted in settings which intimidated and discouraged female applicants, and were conducted in a manner to suggest that the female applicants were not seriously being considered for the jobs. There were numerous instances where District Eight interviewers emphasized the negative aspects of the maintenanceman position during the interview in order to discourage female applicants from pursuing their applications. The interviews of female applicants consistently included repeated references by the interviewers to the fact that one of the duties of the maintenanceman position was the removal of dead animals from the roads. The interviewers in District Eight also emphasized to the female applicants that there were no restroom facilities for women to use while the maintenance crews were on duty, and that the job required long hours and involved dangerous activities in inclement weather. The interviews of male applicants, however, did not include similar emphasis by the interviewers of the undesirable characteristics of the maintenanceman position.

In addition, there were several instances where the interviews of female applicants in District Eight were not conducted in private rooms normally used for interviewing, but were done in open areas with large numbers of highway employees present who would hear and react to the interview. This practice inhibited and intimidated the female applicants, and a similar procedure was not used in the interviews of male applicants in District Eight. There were also instances where the interviewers tried to discourage female applicants by suggesting that the applicant's husband would become jealous if the applicant had to spend the night working on the road in emergencies with male maintenancemen, or by suggesting that the female applicant would be offended by the language of the male maintenancemen.

In a similar vein, female applicants for the maintenance positions in District Eight were reluctant to attend interviews because of telephone calls from interviewers who attempted to discourage the applicants by emphasizing the negative aspects of the job and by advising the applicants that another person was likely to be hired for the position. There were also instances where hiring officials in District Eight encouraged female applicants to pursue other jobs outside the Highway Commission.

The fact that female applicants in District Eight were not given serious consideration for employment is demonstrated by comments made by interviewers on the interview sheets regarding the physical attractiveness of female applicants, and by undue emphasis given by interviewers to the height and weight of female applicants in failing to hire them. Interviewers attempted to discourage female applicants by telling the applicants that they were not strong enough or built right for the job. One interviewer disqualified female applicants who were "too feminine." Although female applicants were rejected ostensibly because they were too light weight, fifteen of the male applicants hired in District Eight from January, 1975 through May 31, 1980 weighed between 110–160 pounds. Similarly, although female applicants were rejected by District Eight because they were too small, fifteen of the male applicants hired in the relevant time period were between 5'5½" tall and 5'8½" tall.

43. Several female applicants testified at trial regarding their futile attempts to obtain employment as maintenancemen in District Eight. Patricia Leembruggen filed an application for employment with District Eight on March 25, 1975. Leembruggen was qualified for the maintenanceman position, as she was a high school graduate and had experience in operating lightweight motor equipment. Despite her qualifications, Leembruggen was not hired by District Eight, nor was she interviewed or even contacted for an interview. District Eight continued to accept employment applications for the maintenanceman position after Leembruggen filed her application for employment. The Highway Commission hired a male to begin employment as a

maintenanceman on April 9, 1975, and hired ten males with qualifications similar to Leembruggen's during the year her application was active.

Similarly, Grace Tuter filed an application for employment with District Eight on June 14, 1976. Tuter was qualified for the maintenanceman position because she was a high school graduate at the time she applied for the position, and because Tuter had the ability to operate lightweight machinery as a result of her farm experience. Although Tuter was interviewed on October 15, 1976, she was not hired and was not considered for any maintenanceman vacancies subsequent to October 15, 1976. Twenty-seven males with qualifications similar to those of Tuter were hired during the year following Tuter's application for employment.

Adeline Kallemyn filed her application for employment with District Eight on September 27, 1976, and was qualified for the maintenanceman position because she was a high school graduate and had the ability to operate lightweight equipment. Although Kallemyn was interviewed for a maintenanceman vacancy on September 27, 1976, and again on June 22, 1977, she was not hired. Numerous males, however, with qualifications similar to Kallemyn's were hired in District Eight for maintenanceman positions during the periods Kallemyn's application was active. During Kallemyn's interviews, interviewers focused on her appearance rather than her qualifications, downgraded Kallemyn's qualifications, and indicated that they did not believe she would be able to handle the undesirable aspects of the maintenanceman position.

On June 25, 1975, plaintiff Jane Catlett inquired at the Marshfield maintenance shed about a maintenanceman vacancy at the Conway Rest Area. Catlett was informed of his opening by the wife of James Coyle, Coyle was a mechanic employed by District Eight. At this time, District Eight had never hired a female to fill a maintenanceman position. Catlett talked to Robert Meyer, the area supervisor for the Marshfield shed, and was given an employ-ment application. Although Meyer advised Catlett that there was no need for her to complete the application that day, Catlett promptly completed the application and returned it to Meyer at the maintenance shed early in the morning of June 26, 1975. When she returned the application form, Catlett asked Meyer questions concerning the employment process, but Meyer acted annoyed and refused to discuss her application, except to say that she was qualified and would be considered for the position, and that she would be contacted by the Highway Commission's office in Springfield.

Despite Meyer's assurances, Catlett was not interviewed nor was she contacted by District Eight concerning the Conway Rest Area vacancy. Later in the morning of June 26, 1975, Meyer went to the District Eight offices in Springfield, informed William Day, the maintenance and traffic engineer for District Eight, that a female had applied for the vacancy, and recommended that a male applicant, Robert Strickland, be hired for the position. On June 30, 1975, V.B. Unsell, the District Engineer for District Eight, filed a requisition form with the Highway Commission requesting approval to hire Strickland. This requisition was approved by Robert Hunter, Chief Engineer for the Highway Commission, on July 3, 1975, and Strickland began his employment on July 7, 1975.

Following the selection of Strickland, Meyer noted that Catlett had listed James Coyle as a reference in applying for the maintenanceman position. Thinking that Coyle had informed Catlett of the vacancy at the Conway Rest Area, Meyer became angry and confronted Coyle, telling Coyle that "you sent that bitch in here, and now I'm going to have to hire her."

The Highway Commission continued to accept applications for employment for entry maintenanceman positions after Catlett filed her application and, in addition to Robert Strickland, nine males were hired in District Eight into entry maintenanceman positions within one year after Catlett filed her initial application for employment.

Catlett, however, was never hired for any position with the Highway Commission.

On March 20, 1976, Catlett filed a charge with the Equal Employment Opportunity Commission, alleging that the Highway Commission failed to hire her for a maintenanceman position because of her sex. The Highway Commission subsequently contacted Catlett and requested that she interview for a maintenanceman vacancy. Catlett attended the scheduled interview at the Marshfield shed on June 22, 1977. At the interview, the District Eight hiring officials attempted to discourage Catlett from wanting to work for the Commission by emphasizing the negative aspects of the maintenanceman position, and by their reluctance to discuss the positive features and benefits of the job. The interviewers made no attempt to determine Catlett's qualifications for employment. Pursuant to the requests of the interviewers, Catlett verbally updated her prior application at the June 22 interview by describing her subsequent job experience, which included maintenance work at a restaurant and clerical work at a university. Catlett refused, however, to disclose the name of the university where she was employed because she was afraid she would lose her job. Although Catlett described the duties involved with her clerical work, the interviewers devoted the majority of the interview to expressing their disapproval of her failure to disclose the name of her employer, and warned Catlett that her refusal would be considered in the hiring decision. In addition, rather than being concerned with Catlett's ability to perform the duties required of the maintenanceman position, the comments of the interviewers on the interview sheet indicate that they were more concerned with what they perceived as flaws in Catlett's personal appearance. In June of 1978, at the request of the Highway Commission, Catlett submitted a written update of her original application.

Despite her apparent qualifications and her expressed interest in employment with the Highway Commission, Catlett was not hired by District Eight nor was she offered a job. During the period of time that Catlett's application for employment and supplements were active, there were more than thirty vacancies for the maintenanceman position in District Eight for which males were hired. Many of the males hired had qualifications similar or inferior to Catlett's qualifications. A review of the conduct of the hiring officials in District Eight regarding the handling of Catlett's application and interview, as well as their haste in hiring a male applicant immediately after Catlett submitted her initial application, clearly demonstrates that the refusal of the Commission to hire Catlett was based on her sex. This finding is further supported by the subsequent hiring decisions made by the Commission while Catlett's application was still active. Furthermore, there was no credible evidence presented at trial to support the Commission's contention that Catlett was not hired because she failed to update her application in a timely fashion, and that she was not hired because other applicants were better qualified.

## II. Conclusions of Law

Under Title VII, there are two separate but related theories available to prove a prima facie case of employment discrimination: disparate treatment and disparate impact. Disparate treatment "is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. Undoubtedly, disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established the allocation of proof governing an individual's claim of disparate treatment. The plaintiff may establish a prima facie case of discrimination in hiring by showing (1) that she was a member of a

protected class; (2) that she applied and was qualified for a job for which the employer was seeking applicants; (3) that she was rejected for the position despite her qualifications; and (4) that, after she was rejected, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. 411 U.S. at 802, 93 S.Ct. at 1824.

While the foregoing describes the general test to be applied in Title VII cases in determining whether the plaintiff has established a prima facie case of discrimination, "[t]he method suggested in *McDonnell Douglas* for pursuing this inquiry was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The courts have recognized that the *McDonnell Douglas* test of a prima facie case is not capable of a literal application in every Title VII case, and that the proof required to demonstrate a prima facie case will vary with each factual situation. *Furnco Construction Corp. v. Waters, supra*, 438 U.S. at 575–76, 98 S.Ct. at 2949. Basically, the plaintiff is only required to "show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 703 (8th Cir.1980) quoting *Furnco Construction Corp. v. Waters, supra*, 438 U.S. at 576, 98 S.Ct. at 2949.

■ By making a prima facie case of disparate treatment, a plaintiff raises an inference of "discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Construction Co. v. Waters, supra*, 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2951. The establishment of a prima facie case "creates a legally mandatory, rebuttable presumption of discrimination." *Jones v. International Paper Company and United Paperworkers International Union*, 720 F.2d 496, 500 (8th Cir.1983). A prima facie showing, however, is not the equivalent of a factual finding of discrimination. *Furnco Construction Co. v. Waters, supra*, 438 U.S. at 579, 98 S.Ct. at 2951. "That is, the employer as a Title VII defendant does not have to prove absence of discriminatory motive to escape liability; a prima facie showing of disparate treatment shifts only the burden of producing evidence to the employer, not the burden of persuasion." *Kirby v. Colony Furniture Co., Inc., supra*, 613 F.2d 696 at 702. The evidentiary obligation of the defendant "is limited to a burden of production." *Jones, supra*, 720 F.2d at 500. To dispel the adverse inference from a prima facie showing of disparate treatment, the employer need only articulate a legitimate, non-discriminatory reason for the plaintiff's treatment. *Furnco Construction Co. v. United States, supra*, 438 U.S. at 577–78, 98 S.Ct. at 2950. If the employer does articulate a justification reasonably related to the achievement of a legitimate goal, the plaintiff must show that the defendant's articulated reason is a mere pretext for discrimination. *McDonnell Douglas v. Green, supra*, 411 U.S. at 804, 93 S.Ct. at 1825. The burden of persuasion remains on the plaintiff, who must convince the trier of fact by a preponderance of the evidence that the challenged employment practice is discriminatory. *Kirby v. Colony Furniture Co., Inc., supra*, 613 F.2d at 703.

■ In comparison, claims based on the disparate impact theory of employment discrimination involve employment practices that are "facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *International Brotherhood of Teamsters v. United States, supra*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15. To make a prima facie case on a disparate impact claim, a plaintiff need not

show that the employer had a discriminatory intent but need only demonstrate that the particular practice results in a discriminatory effect. *Furnco Construction Co. v. Waters, supra,* 438 U.S. at 583, 98 S.Ct. at 2952–53 (Marshall, J. dissenting). The plaintiff need only show that an employment practice operates to exclude a protected class in order to make a prima facie case of discrimination under a disparate impact theory. *Jones, supra,* 720 F.2d at 499. Once a plaintiff has established the disparate impact, the burden shifts to the employer to demonstrate that the practice has a manifest relationship to the employment in question. *Kirby v. Colony Furniture Co., Inc., supra,* 613 F.2d 969, 703. If the employer proves that the challenged practices are justified by business necessity, the plaintiff may then demonstrate that other employment practices lacking a similar discriminatory effect would satisfy the employer's legitimate interest in efficient and trustworthy workmanship. *Id.*

■ Regarding claims of class-wide sex discrimination under Title VII, central to both the disparate treatment and disparate impact theories is the existence of "an identifiable employment pattern, practice or policy that demonstrably affects all members of a class in substantially, if not completely, comparable ways." *Stastny v. Southern Bell Telephone & Telegraph Co.,* 628 F.2d 267, 273 (4th Cir.1980). Under the disparate treatment theory, "this is the 'pattern or practice,' followed as an employer's 'regular or standard operating procedure,' which so demonstrably treats women in relatively unfavorable ways that justifies a rebuttable inference that it proceeds from an intention to treat them differently simply because of their sex." *Id. See Teamsters v. United States, supra,* 431 U.S. at 336, 97 S.Ct. at 1855. Under the disparate impact theory, it is the practive or policy which, "though demonstrably neutral or even benign in any sex-related intent, nevertheless bears with disproportionately adverse impact and without any justification of business necessity upon women." *Stastny v. Southern Bell, supra,* 628 F.2d at 273–74. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). To establish a class-wide pattern or practice of discrimination, a plaintiff must prove "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. 324 at 336, 97 S.Ct. at 1855. The plaintiff must establish by a preponderance of the evidence that discrimination was the employer's standard operating procedure—the regular rather than the unusual practice. *Id.*

## A. THE CLASS CLAIMS

### Statistical Evidence and the Prima Facie Case

[7, 8] Statistical evidence can serve as a useful tool in pattern and practice suits in the determination of whether defendants have engaged in employment discrimination. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). A plaintiff can utilize statistics to establish a prima facie case of disparate impact discrimination. *Royal v. Missouri Highway and Transportation Commission,* 655 F.2d 159, 162 (8th Cir.1981). Statistical evidence also is relevant to a claim of disparate treatment, and statistics showing a general pattern of discrimination are probative on the question of whether the reasons given for a particular action are pretextual. *Bauer v. Bailar,* 647 F.2d 1037, 1045 (10th Cir.1981). The significance of statistical evidence in a given case depends on the surrounding facts and circumstances. *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 340, 97 S.Ct. at 1856.

In *Green v. Missouri Pacific Railroad,* 523 F.2d 1290 (8th Cir.1975), the Eighth Circuit identified three statistical methods of showing a disproportionate impact on minorities. The first procedure considers whether a minority as a class is excluded by the employment practice in question at a substantially higher rate. *Id.* at 1293. The second procedure involves the use of actual

applicant data, comparing the percentage of minority and non-minority applicants actually excluded by a challenged employment practice. *Id.* at 1294. The third procedure examines the level of minority employment by the employer in comparison to the percentage of minorities in the relevant geographic area. *Id.*

The statistical evidence presented in this case clearly establishes a prima facie case of employment discrimination. The plaintiffs' theory that the Highway Commission's word-of-mouth recruiting practices produced an abnormally small pool of female applicants is supported by the fact that there was a gross and statistically significant disparity between the number of women who actually applied for maintenanceman positions and the number of female applicants expected under the moderate and conservative definitions of the labor pool. Similarly, the plaintiffs' contention that the unregulated hiring procedure and the often hostile interview process resulted in the denial of employment opportunities to female applicants on account of their sex is illustrated by the statistically significant difference between the number of women hired for maintenanceman positions and the number of females expected to be hired, and by the disparity that existed in the static workforce. In addition, an examination of the number of males hired in each year compared to the number of females hired supports the conclusion that District Eight engaged in discriminatory employment practices. Although the Highway Commission's Chief Engineer issued a directive on the subject of minority employment in December, 1976, District Eight hired only two women out of fifty-five female applicants in 1977. Although there were 190 males and only two women employed as maintenancemen as of January 1, 1978, District Eight hired only five of the 120 females who applied during that year. In 1979, when six women were employed as maintenancemen at the start of the year, District Eight failed to hire any of the 88 women who applied.

Moreover, the statistical evidence also provides support for the plaintiffs' theory that the number of female applicants was lower due to the word-of-mouth recruiting practices of the Highway Commission. In 1975, when no women had been employed as maintenancemen by District Eight, there were only nine female applicants. In 1976, when the first female was hired as a maintenanceman by District Eight, the number of female applicants rose to sixteen. In 1977, two more women were hired and 55 females applied in District Eight. Similarly, in 1978, the number of women hired in District Eight reached a high of five, and the number of female applicants rose to its highest level at 120. In 1979, no females were hired in District Eight, and correspondingly, the number of female applicants dropped to 88. This parallel relationship between the number of women who were hired each year and the number of females who applied in the same year provides persuasive statistical support for the plaintiffs' contention that the word-of-mouth recruiting practiced by District Eight had an adverse effect on the number of women who applied and were hired for the maintenanceman position.

In rebuttal, the Highway Commission argues that there was no disparate impact because the Commission hired 2.6% of the female applicants between January 1, 1975 and May 31, 1980, while it hired only 2.5% of the male applicants during the same period. This argument is flawed, however, as it assumes that the applicant pool was not influenced by the Commission's recruitment and hiring process. A statistical showing of disproportionate impact need not be based on an analysis of the actual applicants, because "the application process itself might not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory." *Dothard v. Rawlinson*, 433 U.S. 321, 330, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977). *See also Donnell v. General Motors Corp.*, 576 F.2d 1292, 1298 (8th Cir. 1978). Even though the actual applicant

data would indicate that there was no disproportionate impact, general population data (the first and third methods described in *Green*) can provide a basis for a showing of disproportionate impact. *Hammeed v. Intern. Ass'n of Bridge, Etc.*, 637 F.2d 506, 512 n. 6 (8th Cir.1980). "This is particularly the case where there is some threat to the validity of the actual applicant data." *Id.* In this case, the actual applicant data was affected by the Commission's hiring practices, and accordingly, the statistical evidence presented by the plaintiffs establishes at the very least a prima facie case of disparate impact.

■■■■ Although a prima facie showing may in the proper case be made by statistics alone, it may also be established by a cumulation of evidence, including patterns, practices, general policies or specific instances of discrimination. *Equal Employment Opportunity Commission v. American National Bank*, 652 F.2d 1176, 1188 (4th Cir.1981). In this case, the Court is satisfied that the plaintiffs have met their burden of establishing a prima facie case on statistics alone, as the plaintiffs have shown that women not only were hired in District Eight in disproportionate numbers, but also that they applied in similarly disproportionate numbers. This is not, however, a case based solely on statistics. In addition to a substantial and convincing amount of relevant statistical evidence, plaintiffs have enhanced these statistics with direct evidence that the hiring officials in District Eight intentionally discriminated against women as part of a regular pattern and practice. This evidence includes the consistent use of interviews by hiring officials to discourage and intimidate female applicants, the refusal on the part of the Highway Commission to promulgate objective guidelines to correct a hiring process that was known by the Commission to be discriminatory, and the purposeful failure on the part of the Commission to change its word-of-mouth recruiting policy that generated a disproportionately low number of female applicants. This evidence of discriminatory intent removes any question that the disparities established by

the statistics arose merely as a matter of chance.

### The Interviews of Female Applicants

■■■■ Title VII requires that females must have equal employment opportunities, not merely that their applications, if any, be processed fairly. Internal employment practices which deny equal employment opportunity for women are in violation of Title VII. *Harless v. Duck*, 619 F.2d 611, 618 (6th Cir.1980). Discriminatory intent in the interview process may be shown by the interviewer's failure to give a female applicant serious consideration, and by interview questions which do not relate to a bona fide occupational qualification. *King v. N.H. Dept. of Resources & Economic Development*, 562 F.2d 80, 82–83 (1st Cir. 1977).

In District Eight, the employment interviews for the maintenanceman position consistently were conducted in a manner designed to discourage and intimidate female applicants. The interviewers of female applicants regularly emphasized the negative aspects of the job by repeatedly referring to the fact that maintenancemen must remove dead animals from the road and to the fact that there are no restroom facilities available while the maintenance crews are on the road. In addition, the interviewers often conducted the interviews in a manner indicating they did not believe the female applicant could perform the duties required of maintenancemen, and often rejected the assertions of female applicants that they were willing and able to perform the duties required. Unlike the male applicants who generally were interviewed in private rooms at the maintenance sheds, several female applicants were forced to take part in interviews conducted in open areas with numerous highway employees present, a practice which was designed to inhibit and intimidate the female applicants. The fact that these discussions and practices did not occur in the interviews of male applicants clearly demonstrates that the female applicants were not given serious consideration for employment.

These incidents occurred with such frequency in the interview process that there can be no doubt that it was the regular practice of the Highway Commission in District Eight to intentionally discriminate against female applicants. Accordingly, the plaintiffs clearly have made a prima facie showing of disparate treatment as a result of the interview process. In response to this showing, the Highway Commission has not articulated any legitimate reason justifying these interview practices. Instead, the Highway Commission merely denies that these practices ever occurred. This Court finds that the defendant has not rebutted the plaintiff's prima facie case of disparate treatment, and that in any event, even if such rebuttal evidence exists, the plaintiffs have established by a preponderance of the evidence that the employment interviews of female applicants by District Eight constituted a pattern and practice of intentional discrimination which denied the plaintiffs employment opportunities on account of their sex.

### The Unregulated Hiring Process

In *Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir.1976), the Seventh Circuit ruled that a promotion system which operated to exclude blacks was in violation of Title VII, and noted that the system was highly susceptible to abuse because supervisory recommendations played an important role in the promotion process. The Court observed that no written guidelines were established to delineate relevant criteria for promotion, and that the foremen who had to make the recommendations, most of whom were white, had no objective method of evaluating the employees. The Court in *Stewart* felt that such a process totally lacking objective standards "could only reinforce the prejudices, unconscious or not, which Congress in Title VII sought to eradicate as a basis for employment." *Id.* at 450. Similarly, in *United States v. Hazelwood School District*, 534 F.2d 805 (8th Cir.1976), the Eighth Circuit held that a prima facie case of a pattern or practice of employment discrimination existed where there was statistical evidence showing a disparity between the proportion of blacks in an employer's workforce and the relevant labor market, and where the employer's hiring procedures involved the use of vague and subjective criteria. *Id.* at 813. The lack of objective guidelines for hiring and promotion and the failure to post notices of job vacancies are badges of discrimination. *Brown v. Gaston County Dyeing Machine Co.*, 457 F.2d 1377, 1383 (4th Cir.1972). Likewise, in *Rowe v. General Motors*, 457 F.2d 348 (5th Cir.1972), a promotion system was found to be in violation of Title VII because it contained the following features: (1) the foreman's recommendation was an indispensable factor in the promotion process; (2) the foremen were given no written instructions pertaining to the qualifications necessary for promotion; (3) the standards which were controlling were vague and subjective; and (4) there were no safeguards in the procedure designed to avert discriminatory practices. *Id.* at 358–59.

In the present case, the unregulated interview process used by the Highway Commission in District Eight was highly susceptible to discriminatory hiring decisions. In District Eight, the recommendations of the maintenance foremen, area supervisors and superintendents played a critical role in the hiring decisions. No effective written or verbal guidelines on hiring procedure were established by the Highway Commission or by District Eight, and as a result, the interviewers had no objective criteria to delineate the factors relevant to the hiring decision. The interviewers, all of whom were male, were free to exercise their unlimited discretion in evaluating applicants for hire. Even the application form used by District Eight was insufficient, as it failed to provide the interviewers with relevant information concerning the applicant's ability to operate lightweight motor equipment, which was one of the necessary qualifications for the maintenanceman position.

Due to the absence of guidelines to regulate the selection process, the hiring decisions in District Eight were arbitrary and subjective, and as a result, hiring standards

that were applied to female applicants were not the same as those applied to males. For example, the interviewers discounted the farm and labor experience of some female applicants, while male applicants with similar experience were considered to be qualified by the interviewers. Similarly, the requirement that prospective employees live within twenty miles of the maintenance shed was applied more strictly to female applicants. Likewise, a female applicant's lack of size often was considered by the interviewers to be a reason not to hire, while males of similar size were hired by the Commission. One of the most damaging results of the unregulated hiring process clearly was the practice of using the interviews to discourage female applicants.

Highly probative evidence of the intentional discrimination by the Commission is the fact that as early as 1976, both the Commission and District Eight were aware of the urgent need to avoid discriminatory hiring practices regarding female applicants. Although the Commission was aware of this responsibility, and cognizant of the lack of female employees in District Eight, it took no steps to insure that the requirements of Title VII were obeyed and knowingly failed to promulgate any guidelines to regulate the hiring process.

In *Harris v. Ford Motor Co.*, 651 F.2d 609 (8th Cir.1981), the Eighth Circuit recognized that a subjective system of evaluation cannot alone form the foundation for a discriminatory impact case. *Id.* at 611. The Court in *Harris* also recognized, however, that a non-objective evaluation system may be probative of intentional discrimination, especially when discriminatory patterns result, "because such sytems operate to conceal actual bias in decisionmaking." *Id.* Similarly, the Eighth Circuit has recognized that "a case of disparate treatment may be proven where employment decisions are made by supervisors subjectively without definite standards for review, and the decisions resulting in a pattern disfavoring minorities or females." *Satz v. ITT Financial Corp.*, 619 F.2d 738, 746 (8th Cir.1980).

In light of the evidence demonstrating a pattern of discrimination against female applicants in District Eight, this Court finds that the Commission's knowledge that the promulgation of guidelines was necessary to avoid discriminatory results, coupled with its failure to regulate the hiring process in District Eight, constituted a prima facie showing of intentional employment discrimination. The Commission has not rebutted the plaintiffs' prima facie showing, as it has not articulated any legitimate reason justifying the unregulated hiring process. Moreover, even if such a reason were articulated by the Commission, the Court concludes that the plaintiffs have established by a preponderance of the evidence that the unregulated hiring process used by District Eight constituted a pattern and practice of intentional discrimination which denied the plaintiff's employment opportunities on account of their sex.

### Word-of-Mouth Recruiting

[16] Although it is clearly established that Title VII does not require that an employer give preferential treatment to minorities or women or that an employer restructure his hiring practices to maximize the number of minorities and women hired, *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 1096–97, 67 L.Ed.2d 207 (1981), evidence of intentional discrimination may be based upon a history of minimal recruiting efforts in publicizing job vacancies and openings. *Rogers v. International Paper Co.*, 510 F.2d 1340, 1345 (8th Cir.1975). "The passive nature of past recruitment together with the failure to undertake affirmative recruitment efforts after the passage of Title VII may justify a finding of discriminatory conduct." *Id.* The practice of word-of-mouth recruiting, where employment depends primarily upon being referred to the company by an existing employee, has been determined to operate in a discriminatory manner against ˙lacks. *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 427 (8th Cir.1970). In *Parham,* the Eighth Circuit stated that where an employer's work force is almost

completely white, "it is hardly surprising that such a system of recruitment produced few, if any, black applicants. As might be expected, existing white employees tended to recommend their own relatives, friends and neighbors, who would likely be of the same race." *Id. See also United States v. N.L. Industries, Inc.*, 479 F.2d 354, 368 (8th Cir.1973). Although word-of-mouth recruitment is a practice that may be neutral on its face, the procedure often operates adversely against minorities, and is not often justified by business necessity. *United States v. Georgia Power Company*, 474 F.2d 906, 925 (5th Cir.1973).

In the present case, nearly all of the hiring of maintenancemen in District Eight resulted from word-of-mouth recruiting. Although the Highway Commission was aware that few women were applying in District Eight, the Commission made no effort to publicize job vacancies. The statistical evidence supports the plaintiffs' theory that the word-of-mouth recruiting had an adverse effect on the number of female applicants, as the number of females who applied increased as the number of female hires increased, and the number of female applicants decreased when the number of females hired decresed. As was similarly noted by the Eighth Circuit in *Parham*, it is not surprising that this type of recruitment produces few female applicants, as it should be expected that the male employees in District Eight usually would inform only their male relatives and friends of the maintenanceman vacancies. Accordingly, the Court finds that the word-of-mouth recruiting process used by District Eight as its standard operating procedure, although neutral on its face, resulted in a disproportionate effect on the number of females who applied and who were hired. The Highway Commission has presented no evidence, nor does it contend, that this practice has a manifest relationship to employment. Furthermore, the Court concludes that the plaintiffs have clearly established that the word-of-mouth recruiting of District Eight constituted a pattern and practice of employment discrimination resulting in an adverse impact on the plaintiffs.

## B. THE INDIVIDUAL PLAINTIFFS

[17] The Highway Commission argues that plaintiffs Kallemyn, Tuter and Leembruggen cannot stand as individual plaintiffs in this action because they failed to file charges of discriminatio with the Equal Employment Opportunity Commission. Although the Commission concedes that these plaintiffs are members of the class, the Commission nonetheless contends that this Court lacks jurisdiction over their individual claims. In *Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876 (8th Cir.1977), however, the Eighth Circuit held that not every original plaintiff in a multiple-plaintiff, non-class action suit must file charges with the E.E.O.C. In *Allen*, although only two of fifteen plaintiffs had filed charges with the E.E.O.C., the Court concluded that all fifteen plaintiffs were entitled to assert claims for back pay and seniority. *Id.* at 882–83. The court in *Allen* noted that the thirteen additional plaintiffs alleged facts demonstrating that they were similarly situated and had received the same discriminatory treatment as the plaintiffs who had filed E.E.O.C. charges. According to *Allen*, under such circumstances, "particularly where the discrimination is continuing, it would be nonsensical to require each of the plaintiffs to individually file administrative charges with the E.E.O.C. Defendants have in no way been placed in jeopardy." *Id.* In the present case, the allegations and the evidence clearly establish that the three individual plaintiffs are similarly situated and have received the same discriminatory treatment as Jane Catlett. All of the individual plaintiffs have demonstrated that they have been denied employment opportunities as a result of the same recruiting and hiring procedures used by the Highway Commission, and, accordingly, this Court has jurisdiction over their individual claims in light of the Eighth Circuit's ruling in *Allen. See also Crawford v. United States Steel Corp.*, 660 F.2d 663, 665 (5th Cir.1981).

An examination of the evidence in this case reveals that each of the named plaintiffs, Catlett, Tuter, Leembruggen and Kallemyn, has established a prima facie case of discrimination in hiring. Each individual plaintiff has demonstrated that she applied for and was qualified for the maintenanceman position, that she was rejected for the position despite her qualifications, and that after she was rejected, the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications. Accordingly, the establishment of the prima facie case shifts the burden of production to the Highway Commission to articulate a legitimate, nondiscriminatory reason for the plaintiff's treatment.

■ In response, the Highway Commission argues that Catlett, Kallemyn and Tuter were not hired because other applicants with better qualifications were hired. The Highway Commission also contends that Catlett was not hired because she refused to update her application in 1977, and because she failed to respond in a timely manner to the Highway Commission's request for an interview in 1978. Regarding Leembruggen, the Highway Commission does not advance any non-discriminatory reason for its failure to hire, and suggests only that there was no proof that the Commission discriminated against her. In considering the Commission's rebuttal arguments, the Court is aware that an employer does not have to prove the absence of discriminatory motive in order to successfully respond to the plaintiff's prima facie case; rather, the employer need only produce evidence articulating a legitimate, non-discriminatory reason for the plaintiff's treatment. Viewed in light of these standards, the Commission h as met this burden with respect to plaintiffs Catlett, Kallemyn, and Tuter, but has not rebutted the prima facie showing of Leembruggen. The Court is convinced, however, that the reasons articulated by the Highway Commission are pretextual, and that the preponderance of the evidence establishes that each of the four named plaintiffs was subject to discriminatory treatment which resulted in gender-based denial of employment opportunities.

■ During plaintiff Kallemyn's interviews, the interviewers downgraded her qualifications, focused more on her appearance, and expressed their belief that she would not be able to handle the negative aspects of the maintenanceman position. Despite the Commission's contention that better qualified applicants were hired for the three positions for which Kallemyn was considered, there were numerous vacancies during the period of time Kallemyn's application was active which were filled by male applicants who did not possess qualifications superior to Kallemyn's. Similarly, during the period of time Leembruggen's application was active, ten males with qualifications similar to hers were hired. Likewise, twenty-seven males with qualifications similar to those of Grace Tuter were hired during the year following her application.

■ A review of the circumstances surrounding Jane Catlett's experiences with District Eight clearly demonstrates that the reasons articulated by the Commission for not hiring her are mere pretexts for its discriminatory conduct. On June 25, 175, Jane Catlett inquired at the Marshfield shed about a vacancy which the Commission was about to fill. Although a hiring decision was to be made in the near future, the area supervisor tried to deceive Catlett by telling her that there was no need for her to complete the applications promptly. Nonetheless, Catlett completed the application and returned it to the shed early the next day. When Catlett returned the application, the area supervisor was uncooperative and refused to discuss Catlett's application with her. Later that morning, the supervisor drove to the district offices in Springfield, advised the maintenance and traffic engineer that a female had applied for the vacancy, and recommended that a male applicant be hired for the position. Catlett was not hired for this opening, nor was she interviewed for it, and during the year that her application was active, nine

males were hired in District Eight with qualifications similar to Catlett's.

It was not until after Catlett filed a charge of discrimination with the E.E.O.C. that she was contacted for an employment interview. At the interview, the hiring officials tried to discourage Catlett from pursuing employment with the Commission by their emphasis of the negative aspects of the job and by their reluctance to discuss the job's benefits. At the interview, the interviewers were more concerned with Catlett's personal appearance than with her qualifications. Finally, during the time periods Catlett's application and supplements were active, there were more than thirty vacancies, for which numerous male applicants were hired with qualifications similar or inferior to Catlett's.

A careful review of the evidence in this case clearly establishes that plaintiffs Catlett, Tuter, Leembruggen and Kallemyn each have shown that they were intentionally denied employment opportunities on account of their sex. Just as the class members were subjected to a pattern of discrimination resulting from the biased interview process and the unregulated hiring procedure, similarly, these plaintiffs were the individual victims of the same practices.

In conclusion, this Court finds that the Missouri State Highway Commission, through its hiring policies, has engaged in a practice of discrimination against female applicants for the maintenanceman position. It is a serious matter when any employer engages in employment discrimination, but it seems particularly grave for the State to practice discrimination against its own citizens, as these are the people who pay the taxes that support and maintain the government, and whom the elected and appointed officials are to serve. It is distressing and demeaning that a branch of the Missouri state government should be guilty of unlawful discrimination against its own citizens.

Accordingly, it is hereby

ORDERED that judgment be entered in favor of the class and against the Missouri State Highway Commission on the Title VII class action claim. It is further

ORDERED that judgment be entered in favor of plaintiffs Jane Catlett, Adeline Kallemyn, Grace Tuter and Patricia Leembruggen and against the Missouri State Highway Commission on the individual Title VII claims. It is further

ORDERED that within fifteen (15) days of the date of this order, the parties are to submit a discovery schedule regarding the relief and damages stage of this litigation.